(109 P.3d 1255)
No. 92,325

Kristi L. Wheeler, *Appellee,* and Cincinnati Insurance Co., *Intervenor/Appellee,* v. Rolling Door Company; Automatic Services Corporation, d/b/a Rolling Door Company and Aero Systems Corporation; ASC Aero Systems Corporation, d/b/a Rolling Door Company and Aero Systems Corporation; E.W. Johnson, Inc.; Burns & McDonnell Engineering Company, Inc., *Defendants,* and State of Kansas, *Appellant.*

Opinion filed April 1, 2005.

*Eliehue Brunson,* assistant deputy attorney general, for appellant.

*John W. Johnson,* of Bradshaw, Johnson & Hund, of Wichita, and *Shari R. L. Willis,* of Powell, Brewer & Reddick, of Wichita, for appellee, Kristi L. Wheeler.

Before GREEN, P.J., PIERRON and CAPLINGER, JJ.

GREEN, J.: Kristi Wheeler sued the State of Kansas and others on claims of negligence, based on the injuries she sustained while preparing for the Kansas Starbase program. The parties filed cross-motions for summary judgment on the issue of whether Wheeler was the State's statutory employee under K.S.A. 44-503(a) of the Workers Compensation Act (Act), K.S.A. 44-501 *et seq.,* and, therefore, precluded from obtaining relief on her negligence action. The

Act provides the exclusive remedy for injured employees. Determining that the State had not met its burden of proof on this issue, the trial court ruled that Wheeler was not the State's statutory employee and granted Wheeler's motion for summary judgment. The State brings this interlocutory appeal from that decision. We determine that a genuine issue of material fact remains regarding whether the National Guard Bureau of the United States Department of Defense (NGB) had contracted with the State to furnish the teaching and site coordination services that Wheeler was performing and whether the State had in turn contracted with Wheeler's employer, Smoky Hill Education Service Center (Smoky Hill), for these services. As a result, we affirm in part, reverse in part, and remand.

Wheeler was employed by Smoky Hill and worked as a site coordinator and teacher in the Kansas Starbase program at Wichita's McConnell Air Force Base. Smoky Hill had contracted with the Kansas Air National Guard (Guard) to employ and supervise the Kansas Starbase state director and employees. The accident occurred one morning in June 1999 when Wheeler, while preparing for a Starbase academy, suffered serious injuries when opening a truck hangar door.

After her accident, Wheeler sued several defendants including the State. It appears that the other defendants have settled with Wheeler and have been dismissed from the case. Wheeler's suit against the State was based on claims of negligence. The case went to trial, and the jury rendered a verdict in favor of Wheeler and found the State 100 percent at fault. On appeal, however, a panel of this court reversed and remanded the case on various issues. As part of its ruling, the panel directed the trial court to consider whether Wheeler was the State's statutory employee. Apparently, the State had raised this issue in two summary judgment motions before trial, but the trial court had never addressed the issue. See *Wheeler v. Rolling Door Co.*, No. 88,478, unpublished opinion filed May 9, 2003.

After the case was remanded, the State filed a supplemental motion in support of its second summary judgment motion previously filed. Pointing out that the Act contains an exclusive remedy

provision, the State argued that it was Wheeler's statutory employer under K.S.A. 44-503(a) of the Act and thus immune from her tort suit against it. Wheeler responded to the motion and also moved for partial summary judgment and judgment as a matter of law on the statutory employment issue. Wheeler argued that the State could not meet its burden to show that Wheeler was its statutory employee. The parties agreed that the statutory employment issue raised a legal question which had to be determined as a matter of law. Moreover, the parties requested that in ruling on these motions, the trial court determine that the matter was appropriate for interlocutory appeal.

The trial court granted Wheeler's motion for partial summary judgment and judgment as a matter of law. The trial court determined that Wheeler was not the State's statutory employee when she was injured. In addition, the trial court denied the State's second motion for summary judgment. Determining that an interlocutory appeal was appropriate in this case, the trial court stayed the proceedings until this court issues a decision on the issue. The State now appeals from the trial court's ruling.

*Summary Judgment Standard*

Our review of the trial court's grant or denial of summary judgment is well established:

"Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, [the reviewing court must] apply the same rules and where . . . reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. [Citation omitted.]" *Bracken v. Dixon Industries, Inc.*, 272 Kan. 1272, 1274-75, 38 P.3d 679 (2002).

Although both parties assert that summary judgment was appropriate on the issue of whether the State was Wheeler's statutory employer, the trial court was still required to determine whether

a genuine issue of material fact remained before granting summary judgment. The mere filing of cross-motions for summary judgment does not obligate a trial court to enter summary judgment. Rather, the trial court must independently determine whether a genuine issue of material fact exists. 73 Am. Jur. 2d, Summary Judgment § 43, pp. 684-85.

*Exclusive Remedy Rule*

Initially, we note that the Act contains an exclusive remedy provision limiting recovery by injured employees from their employers to that prescribed under the Act. K.S.A. 44-501(b) states: "Except as provided in the workers compensation act, no employer, or other employee of such employer, shall be liable for any injury for which compensation is recoverable under the workers compensation act." Thus, "[t]he remedy provided in the Kansas Workers Compensation Act is exclusive and a worker may not maintain a common-law action for damages founded upon negligence against a party from whom he or she could have recovered compensation from that employer under the Act. [Citation omitted.]" *Robinett v. The Haskell Co.*, 270 Kan. 95, 97, 12 P.3d 411 (2000). In order for the State to prevail on the exclusive remedy defense, it has the burden of proof to establish an employment relationship between it and Wheeler under the Act. See *Anderson v. National Carriers, Inc.*, 10 Kan. App. 2d 203, 206, 695 P.2d 1293, *rev. denied* 237 Kan. 886 (1985).

*Statutory Employer Provision*

K.S.A. 44-503(a), the statutory employer provision of the Act, states:

"Where any person (in this section referred to as principal) undertakes to execute any work which is a part of the principal's trade or business or which the principal has contracted to perform and contracts with any other person (in this section referred to as the contractor) for the execution by or under the contractor of the whole or any part of the work undertaken by the principal, the principal shall be liable to pay to any worker employed in the execution of the work any compensation under the workers compensation act which the principal would have been liable to pay if that worker had been immediately employed by the principal; and where compensation is claimed from or proceedings are taken against the principal, then in the application of the workers compensation act,

references to the principal shall be substituted for references to the employer, except that the amount of compensation shall be calculated with reference to the earnings of the worker under the employer by whom the worker is immediately employed. For the purposes of this subsection, a worker shall not include an individual who is a self-employed subcontractor."

K.S.A. 44-503(a) "extends the application of the Kansas Workers Compensation Act to certain individuals or entities who are not the immediate employers of the injured workers, but rather are 'statutory employers.' [Citation omitted.]" *Robinett*, 270 Kan. at 98. Under this statute, "a principal will be liable to the employee of a subcontractor if the principal undertakes to do work which (1) is a part of the principal's trade or business, or (2) the principal has contracted to do for a third party." *Harper v. Broadway Mortuary*, 6 Kan. App. 2d 763, 764, 634 P.2d 1146 (1981). Because the parties raise arguments under each of these alternatives, we will consider each one separately.

It is important to point out that although Wheeler has sued the State as a whole, the "principal" under the facts of this case is the Guard. Under Kansas law, the Guard is the organized militia of this State. K.S.A. 48-201. The Guard, acting on behalf of the State, contracted with the NGB regarding the Kansas Starbase program. In addition, the Guard contracted with Smoky Hill to provide the employees for the Kansas Starbase program. Accordingly, the parties have presented their arguments under K.S.A. 44-503(a) with the Guard as the "principal."

*Liberal Construction of the Act*

In addressing the parties' arguments, this court must bear in mind that K.S.A. 44-501(g) requires us to liberally construe the Act to bring both injured employees and employers under it. K.S.A. 44-501(g) states:

"It is the intent of the legislature that the workers compensation act shall be liberally construed for the purpose of bringing employers and employees within the provisions of the act to provide the protections of the workers compensation act to both. The provisions of the workers compensation act shall be applied impartially to both employers and employees in cases arising thereunder."

Moreover, this court noted in *Rodriguez v. John Russell Constr.*, 16 Kan. App. 2d 269, 271, 826 P.2d 515 (1991), "the rule has long

been stated in our reported cases that the Workers Compensation Act is to be liberally construed to allow coverage *whether invoked by the worker or statutory employer.* [Citations omitted.]" (Emphasis added.)

*Uncontroverted Facts*

The following uncontroverted facts are gleaned from the parties' summary judgment motions and attached exhibits. The Kansas Starbase program is a federal government program educating at-risk children in science and math. The program was started to support schools. More important, the program was to help students facing a substantial amount of adversity, to inspire them to remain in school, and to give them the tools needed to compete effectively. The Kansas Starbase program has been in operation since October 1993.

A pilot program, which was conducted for 1 or 2 weeks, introduced the Kansas Starbase program the summer before the program commenced. The pilot's participants were as follows: Guard volunteers; teacher volunteers; Boys and Girls Club; Kansas Gas and Electric; and Derby and Wichita, Kansas, school districts. The State attempted to controvert this fact set forth in Wheeler's motion by arguing: (1) that Tod M. Bunting's testimony indicated that the initial programs involved only Guard members and (2) that the actual name for the 2-week summer program was "academy" and not "pilot program." Nevertheless, in the State's summary judgment motion, it refers to the 2-week program as a "pilot program." Further, Bunting's testimony indicated that the above participants were involved in the summer program. Moreover, while Bunting indicated initially that it was all military volunteers who taught the classes in the summer program, he later testified that there were also civilian teachers who taught the classes. Bunting was in charge of the summer program.

In 1994, the South Central Kansas Education Center (SCKEC) was contracted to coordinate the Kansas Starbase program. The SCKEC provided a full-time staff and worked on and developed the curriculum.

The Kansas Starbase program is funded principally by a federal grant from the United States Department of Defense. The grant

is channeled through the State, which contracted with SCKEC and then Smoky Hill to implement the Kansas Starbase program. Starbase, Inc., a charitable § 501(c)(3) board, see 26 U.S.C. § 501(c)(3) (2000) (exempt under Internal Revenue Code) was also set up to raise money and fund the Kansas Starbase program. The Kansas Starbase program has grown to be the largest in the nation.

Under the 1998 agreement between Smoky Hill and the Guard, Smoky Hill was contracted to employ, to supervise, and to administer the state director and employees of the Kansas Starbase program. The State attempted to controvert this fact by referring to an affidavit signed by Bunting and by stating that the Kansas Starbase program "was supervised and administered under the direction of the Kansas National Guard." Bunting's affidavit stated that the adjutant general's department was responsible for the overall operation of the Kansas Starbase program. Moreover, Bunting stated that the contractor was responsible to the Adjutant General of Kansas (TAG). Although this may be true, these facts do not controvert that Smoky Hill was hired to employ, to supervise, and to administer the state director and employees of the Kansas Starbase program. The 1998 contract between the Guard and Smoky Hill required Smoky Hill to:

"a. Employ, pay and supervise with assistance of TAG, the Starbase State Director.

"b. Employ, pay and supervise with assistance of TAG, and Starbase State Director other Starbase employees.

"c. . . . [S]upport Starbase Program through Grant writing, marketing and providing suggestions and input in the Starbase curriculum.

"d. Provide to employees of Kansas Starbase health insurance, life insurance, sick leave, and holiday leave as to be agreed to by both Vender and TAG."

The Kansas Starbase program had no employees. Instead, at all times relevant, Smoky Hill hired employees and assigned them to the program. Again, the State attempted to controvert this fact by referring to Bunting's affidavit and stating that the Kansas Starbase program operated under the supervision of TAG. Bunting's affidavit, however, does not controvert this "uncontroverted fact" set forth by Wheeler. Although Kansas Starbase may have operated under TAG's supervision, the program itself had no employees.

At all times material in this case, Smoky Hill ran the Kansas Starbase program with the assistance of Guard volunteers. Curriculum coordinators such as Wheeler would teach some subjects, and volunteers would teach some subjects in the program. From time to time, military volunteers would cancel their Starbase engagement when conflicts arose between their scheduled volunteer time and their actual military duties. When these conflicts occurred, the curriculum coordinators would be required to find different volunteers or to teach the classes themselves. Although the State concedes that the military's involvement was on a volunteer basis, the State maintains that the volunteers were considered on duty because they were in uniform and received credit for their participation.

Like the Kansas Starbase program, the South Dakota and Oregon Starbase programs operated with teachers hired by independent contracting school districts along with guard volunteers. In these programs, uniformed national guard personnel would teach or conduct demonstrations or both with the Starbase teachers as part of their work day.

The normal trade or business of the Guard is to protect Kansas citizens. The Guard is the organized militia of this State and shall be ready to be called into active duty by the Governor for tumult, riot, breach of peace, invasion, or war.

At all times relevant, Wheeler was employed by Smoky Hill and worked as an instructor coordinator, site coordinator, and curriculum coordinator in the Kansas Starbase program. She was first hired as a coordinator in the Salina Starbase program in August 1998 and then came to the Wichita Starbase program around May 1999. Like other site coordinators, Wheeler was a certified teacher. Wheeler's job responsibilities were a mix of coordinating and teaching for the Kansas Starbase program. These responsibilities included

"coordinating volunteers; setting up schedules; organizing and providing teacher workshops; hosting children in the classroom; making sure all the supplies are available; placing phone calls; arranging transportation; scheduling speaking volunteers; scheduling bus driving volunteers; scheduling tour volunteers; developing videotaped training demonstrations; providing assistance to other curriculum co-

ordinators/site coordinators around the state; developing new and innovative ways to teach established curriculum; providing training to new site coordinators; handling enrollments and other Starbase paperwork; assisting with the preparation of student packets, the ordering of supplies, the copying of materials, and site preparation and clean up; setting up and running booths at conventions, educational and military conferences, flight shows, and the like to promote the Kansas Starbase program; giving advice to volunteers on how to better present materials; recruiting, training and organizing volunteers; modifying curriculum to better meet the needs of the particular students, preparing PowerPoint presentations; keeping track of the inventory; seeking promotion and advertising through print, television, and radio media; and writing news articles, creating newsletters."

The State sought to controvert this "uncontroverted fact" set forth by Wheeler. The State maintained that Wheeler was not the only teacher, asserting that members of the Guard taught alongside her. This single statement, however, controverts nothing concerning the job duties she performed.

*I. Was the work performed by Wheeler a part of the Guard's trade or business under K.S.A. 44-503(a)?*

The State maintains that Wheeler's employment fits both alternatives under K.S.A. 44-503(a), thus making it Wheeler's statutory employer. The first alternative under K.S.A. 44-503(a) asks whether the work performed by Wheeler was a part of the Guard's trade or business. In *Hanna v. CRA, Inc.*, 196 Kan. 156, 159-60, 409 P.2d 786 (1966), our Supreme Court set forth the following tests to determine whether the work being performed is a part of the principal's trade or business:

"(1) [I]s the work being performed by the independent contractor and the injured employee necessarily inherent in and an integral part of the principal's trade or business? [and] (2) is the work being performed by the independent contractor and the injured employee such as would ordinarily have been done by the employees of the principal?"

The *Hanna* court further noted that "[i]f either of the foregoing questions is answered in the affirmative the work being done is part of the principal's 'trade or business,' and the injured employee's sole remedy against the principal is under the Workmen's Compensation Act." 196 Kan. at 160.

## A. *The First Hanna Test*

Our Supreme Court in *Bright v. Cargill, Inc.*, 251 Kan. 387, 837 P.2d 348 (1992), clarified the *Hanna* tests. The *Bright* court endorsed the following rationale found in Larson's treatise on workers compensation:

" '. . . [T]*he test is not one of whether the subcontractor's activity is useful, necessary, or even absolutely indispensable to the statutory employer's business,* since, after all, this could be said of practically any repair, construction or transportation service. The test (except in cases where the work is obviously a subcontracted fraction of a main contract) is whether this indispensable activity is, in that business, normally carried on through employees rather than independent contractors.' (Emphasis added.) 1C Larson, Workmen's Compensation Law § 49.16(j), pp. 9-105—9-106 (1991)." *Bright,* 251 Kan. at 398.

The *Bright* court went on to explain that the question under the first *Hanna* test is whether other similar businesses perform the work through their employees or contract out the work. The *Bright* court further stated that even if similar businesses would not perform the work through their employees, "the particular principal may make such work 'a part of its trade or business' by its own past actions." 251 Kan. at 399.

In this case, the trial court analyzed the facts under both *Hanna* tests but determined that the State had not met its burden of proof on these theories. The trial court determined that the evidence in this case, even when taken in the light most favorable to the State, showed that other states' national guard units generally do not operate the Starbase program by themselves. Instead, they typically contract out the work to school districts as independent contractors that hire teaching staff and oversee the programs while military and nonmilitary volunteers assist with some of the instruction. Moreover, the trial court determined that the work performed by Smoky Hill and Wheeler was not something the Guard would normally do through its own employees. The trial court stated that the Guard would normally contract out this work and that the Guard could not do the work without a contractor's assistance.

In arguing that the *Hanna* tests were satisfied in this case, the State points out that the guard units in other locations sponsor the Starbase program. Nevertheless, in neither its summary judgment

motion nor its response to Wheeler's partial summary judgment motion did the State point to any facts showing that these other guard units had employees that were doing the work performed by Wheeler. Instead, the uncontroverted facts in this case established that other similar businesses, the Starbase programs in South Dakota and Oregon, had contracted this work out to local school districts. In fact, in its motion for summary judgment, the State concedes that the South Dakota and Oregon Starbase programs operated just like the Kansas Starbase program was operating at the time of Wheeler's injury.

The State further maintains that Wheeler did the same work as had been done by Guard members at McConnell Air Force Base in the past. Presumably, the State's assertion relates to the 2-week pilot program that occurred in the summer of 1993. Nevertheless, in its summary judgment motion, the State sets forth that the pilot program occurred "during the summer before the Kansas Starbase program even began." Moreover, Bunting's testimony indicated that the program was put on through the efforts of several different entities and individuals, including civilian teachers who taught some of the classes. A 2-week pilot program that occurred before the Kansas Starbase program even began cannot be compared to the current Kansas Starbase program which has grown to become the largest of its kind in the United States.

Wheeler has presented evidence to show that the work being performed by her at the Wichita Starbase academy was materially different from the type of work performed by the Guard's own employees. Wheeler, a certified teacher, had the responsibility to set up and teach an established curriculum for the Kansas Starbase program. She was responsible for ordering supplies, copying material, and preparing student packets. In addition, she recruited, trained, and organized the Kansas Starbase volunteers. The State presented evidence that Guard members taught alongside Wheeler; however, these members were volunteers who did not have the job responsibilities of Wheeler. The State has failed to bring forward any evidence indicating that the Guard had teachers in its workforce who were employed to put together the curriculum, order special supplies and materials, and teach the students

in the Kansas Starbase program. The State can point to no employees in the Guard's workforce that were performing the duties of Smoky Hill employees. As a result, the work performed by Wheeler in the Kansas Starbase program was not "inherent in and an integral part" of the Guard's business as defined in the first *Hanna* test.

## B. *The Second Hanna Test*

The second *Hanna* test considers whether the work performed by Wheeler would ordinarily have been done by the Guard's employees. The Guard employees had very little to do with running the Kansas Starbase program. Instead, the Kansas Starbase employees were provided through the Guard's contract with Smoky Hill. As set forth above, Wheeler's job duties were not something that Guard employees would ordinarily perform. As a certified teacher, Wheeler had the skill to set up and modify the curriculum for the program. The State has failed to show that the Guard had the necessary employees to perform Wheeler's job responsibilities. Consequently, the work done by Wheeler would not have ordinarily been done by the Guard employees.

Based on the above analysis, we determine, as a matter of law, that Wheeler has carried her burden to prove that the State was not her statutory employer under either the first or second prong of the *Hanna* test. The State has failed to come forward with evidence in either its summary judgment motion or its response to Wheeler's partial summary motion establishing a genuine issue of material fact under the *Hanna* tests.

## II. *Is the work something the Guard had contracted to do for the NGB?*

The State also argues that it is entitled to immunity because the facts of this case come within the second alternative of K.S.A. 44-503(a), the "contracting out contracted work" portion of the statute. The trial court considered this alternative under K.S.A. 44-503(a) but determined that the State had not met its burden on this theory.

The trial court cited to *Rodriguez v. John Russell Constr.*, 16 Kan. App. 2d 269, 826 P.2d 515 (1991). In that case, the plaintiff

claimed he was the statutory employee of Garden City after he was injured while repairing the roof of a low-income housing facility. The housing facility was a Housing and Urban Development (HUD) subsidized project, which was operated by the Garden City Housing Authority under HUD guidelines. The Garden City Housing Authority had contracted with plaintiff's employer to repair the roof at the housing facility. The plaintiff sought workers compensation coverage, but both the administrative law judge and the trial court determined that he failed to prove that he was the City's statutory employee. On appeal, this court reversed the decision and determined that the plaintiff was Garden City's statutory employee under the first alternative of K.S.A. 44-503(a). 16 Kan. App. 2d at 274-75, 276. The court, however, determined that the facts of the case did not fall within the "contracting out contracted work" part of 44-503(a). Noting that HUD and Garden City may have had a contractual relationship, the court nevertheless stated: "[T]here was no specific evidence that HUD contracted with Garden City, which in turn contracted with Russell Construction for the repair of the roof." 16 Kan. App. 2d at 275.

The *Rodriguez* court distinguished its case from *Harper v. Broadway Mortuary*, 6 Kan. App. 2d 763, 634 P.2d 1146 (1981). There, the mortuary had contracted with its customer for a funeral. The mortuary then contracted with the plaintiff's employer, Air Capitol Escort Service, for a funeral procession escort. The plaintiff was killed while performing this service. In determining that the "contracting out contracted work" portion of K.S.A. 44-503(a) applied there, the *Harper* court stated:

"Appellant [the mortuary] had contracted with a customer to provide a motorcycle escort for the funeral procession. In order to perform this contract obligation, appellant could either have hired an employee to ride as escort, or it could subcontract the work to a local escort service. Appellant chose the latter course." 6 Kan. App. 2d at 765.

Noting that the tests under the first portion of K.S.A. 44-503(a) did not have to be applied, the court stated: "By contracting to provide an escort service for a third party, appellant made the work a part of its business." 6 Kan. App. 2d at 765.

Based on the *Rodriguez* and *Harper* cases, the question to be addressed here is whether the NGB contracted with the Guard to provide the teaching and site coordination services that Wheeler was performing and whether the Guard in turn had subcontracted with Smoky Hill for these services. In its summary judgment motion, the State argued that Wheeler was performing work under a subcontract with the Guard that the Guard itself had contracted to perform.

Determining that the State had failed to meet its burden of proof on this theory, the trial court stated: "The Court cannot find defendant undertook to execute specific work tasks which it had contracted to perform, and then 'contracted with Smoky Hill for the performance of *that* work' as required by K.S.A. 44-503 and *Rodriguez*." The trial court looked to the Master Youth Programs Cooperative Agreement (MYCA) issued by the NGB to the State but found no language indicating that the State agreed to provide the educational instruction, site coordination, or any other job responsibilities that Wheeler performed. The trial court also found that Smoky Hill, in its contract with the State, did not specifically assume the job responsibilities performed by Wheeler.

Nevertheless, in reviewing the evidence in this case, there is some indication that the State had contracted to operate the Starbase program which encompassed those duties ultimately performed by Wheeler. According to affidavits and testimony from Kansas Adjutant General Bunting, the Kansas Starbase program started through a contract between the State and the NGB. Bunting indicated that the Guard had later contracted with Smoky Hill to administer the program. The contracts entered into between the NGB and the State and between the State and Smoky Hill support Bunting's testimony. Wheeler, who was employed by Smoky Hill, was injured while preparing for the Kansas Starbase program. Evidence exists that the NGB had contracted with the State to operate the Kansas Starbase program and that the State had in turn contracted with Smoky Hill to administer the program and that Wheeler then became injured while carrying out the work of the Starbase program.

Although the evidence does not conclusively establish that Wheeler was a statutory employee under the "contracting out contracted work" portion of K.S.A. 44-503(a), the evidence raises a material question of fact. The evidence of the contract between the NGB and the State and the contract between the State and Smoky Hill raises a permissible inference that Wheeler was a statutory employee of the State when she was injured. "Factual inferences tending to show triable issues must be considered in the light most favorable to the existence of those issues." *Seabourn v. Coronado Area Council, B.S.A.*, 257 Kan. 178, 189, 891 P.2d 385 (1995). Consequently, we determine that a genuine issue of material fact remains as to whether Wheeler was a statutory employee under the "contracting out contracted work" portion of K.S.A. 44-503(a).

Moreover, even if we were to determine that no genuine issue of material fact exists after the above analysis, the State has come forward with evidence that seems to provide the linkage showing that it had contracted with the NGB to undertake the work performed by Wheeler. In its response to Wheeler's summary judgment motion, the State came forward with a document entitled "Kansas STARBASE FY 1999/2000 Annual Plan" which was purportedly "Attachment D" of the MYCA. The MYCA lists Appendix D as "Approved State Plan." Appendix D, however, was not attached to the MYCA. The State included an affidavit from the Kansas Starbase Executive Director Jeff Gabriel who had found the document. Gabriel the discovered the document on a floppy disk that had been stored in a box at the Starbase offices in Wichita. Gabriel stated that he had never seen a hard copy of the State plan for the 1999/2000 period until he downloaded this document.

The trial court refused to consider this document as Attachment D. The trial court stated that the document was not marked as "Attachment D," was not discovered as an MYCA attachment, and was not entitled "Approved State Plan." Further, the trial court stated that "the document has not been authenticated by anyone who had any personal knowledge of it at the time it was originally created."

We believe that the trial court prematurely disregarded the document. The State did not discover the purported Attachment D until March 10, 2004, only 9 days before the trial court conducted the hearing on the summary judgment motions. The trial court's concern that the document was not properly authenticated might be remedied if the State is given the opportunity and the time to effect such authentication.

We determine that the evidence raises a genuine issue of material fact as to whether the work performed by Wheeler came within the "contracting out contracted work" provision of K.S.A. 44-503(a). Therefore, we reverse the trial court's ruling on this issue and remand for trial.

Affirmed in part, reversed in part, and remanded.