(248 P.3d 758)
No. 102,598

THOROUGHBRED ASSOCIATES, L.L.C., *et al.*, *Appellants/Cross-appellees*, v. KANSAS CITY ROYALTY COMPANY, L.L.C.; ROBERT E. THOMAS REVOCABLE TRUST; and D.D.H., L.L.C., *Appellees/ Cross-appellants*.

314

Opinion filed February 11, 2011.

*David J. Rebein*, of Rebein Bangerter, P.A., of Dodge City, and *Jeff Kennedy* and *Marcia A. Wood*, of Martin, Pringle, Oliver, Wallace & Bauer, L.L.P., of Wichita, for appellants/cross-appellees.

*William J. Skepnek*, of Skepnek Fagan & Davis, P.A., of Lawrence, and *David E. Pepper* and *Michael J. Novotny*, of Hartzog Conger Cason & Neville, of Oklahoma City, Oklahoma, for appellees/cross-appellants.

Before MCANANY, P.J., ATCHESON, J., and LARSON, S.J.

ATCHESON, J.: This appeal arises out of the development of an oil and gas lease in Comanche County and began life as a petition filed more than 8 years ago. In its lifetime, this case has experienced several rounds of summary judgment motions, an interlocutory appeal to this court turned aside without briefing, and a bench trial. The case is back here this time for a full airing of the issues on cross-appeals.

*Summary of the case*

· Thoroughbred Associates, L.L.C., the lead plaintiff below, acquired and developed the lease at the center of the legal dispute and leases on several nearby tracts. The other plaintiffs hold various oil and gas interests in the same tract as Defendant Kansas City Royalty Company, L.L.C., and the other defendants. Those defendants own a one-third interest in the oil and gas rights in the land covered by the lease litigated here. They acquired that ownership

interest from OXY, USA, Inc. The parties commonly refer to the lease as the OXY lease, and we will do likewise. We refer to the plaintiffs collectively as Thoroughbred and to the defendants collectively as Kansas City, for we see nothing in the issues that requires us to distinguish among the individual constituents in either group.

In short, Thoroughbred contends the OXY lease was erroneously included in a production unit contrary to the terms of the lease and seeks recoupment from Kansas City for production revenue it says was improperly paid according to terms of the lease and the unitization agreement. The trial judge entered summary judgment against Thoroughbred on that issue. Kansas City counterclaimed for additional revenue, contending Thoroughbred had both extracted unleased hydrocarbons owned by Kansas City without authorization and wrongfully withheld revenue due from the production unit once this litigation began. Kansas City further claimed Thoroughbred drained the tract covered by the OXY lease from wells it drilled on the adjacent land. The trial court granted summary judgment to Kansas City on its revenue claims but entered judgment against Kansas City following a bench trial on the drainage claim. The parties ultimately stipulated to the amount due on the revenue claim. Kansas City sought prejudgment interest and attorney fees under the Interest On Proceeds From Production Act, K.S.A. 55-1614 *et seq.* The trial court awarded Kansas City prejudgment interest but only one-third of the requested attorney fees.

Neither side left the Comanche County courthouse happy. Thoroughbred filed an appeal, and Kansas City cross-appealed. Between them, the parties have asked that we review each of the adverse outcomes rendered in the trial court. We have done so. And we affirm the district court on all of them.

*The facts and procedural history: Concentrated for appeal*

In outlining the factual background of the lease acquisition and development, we draw heavily on the undisputed findings the district court rendered both in various interim rulings and in a comprehensive memorandum and journal entry filed after the bench

trial. We offer so much of that history as we think necessary to fully and fairly address the points on appeal while not burdening this opinion with extraneous detail. The parties may find the resulting rendition more of an overview than an in-depth narrative. But we endeavor to provide the defining events in the life of *Thoroughbred v. Kansas City*—not its comprehensive biography.

In 1998, Thoroughbred drilled a highly productive gas well on a section tract in Comanche County commonly called the Thoroughbred-Bird Unit. Based on that success, Thoroughbred acquired development rights in mid-1998 for mineral interests on nearby land, including the OXY lease. Representatives of OXY, USA, Inc., and Thoroughbred negotiated the terms of the lease, and the document was signed on July 21, 1998. The lease contains two provisions pertinent to the legal dispute before us.

First, the written lease provides for limited unitization rights permitting Thoroughbred to combine the tract with others only as "necessary to conform with regular [well] spacing patterns, or to produce a full allowable where such spacing pattern or allowables are established by State, Federal or other regulatory bodies." Once the lease had been unitized under those terms, a well drilled on any part of the combined land would be treated as a well on the specific leased land, thus, for example, continuing the term of the lease by production. But the undisputed evidence produced in this case shows that the representatives of OXY, USA, Inc., and Thoroughbred actually negotiated and agreed upon unitization of the lease without restriction and intended inclusion of the tract in what was known as the Rietzke Unit. In short, the written lease failed to correctly reflect the parties' mutual understanding on unitization.

Second, the lease contains what is commonly called a "Pugh clause" limiting the extent to which the lease would be perpetuated through production from a well elsewhere in the unit. In the OXY lease, the clause provides that "actual drilling on, or production from, any unit . . . shall maintain this lease in force . . . only to depths from the surface down to the deepest producing interval." That is, production elsewhere in the unit would continue the lease only as to minerals that might be found no deeper than that pro-

duction; the right to explore for or to extract minerals below that level would lapse consistent with the lease terms. The operation of the Pugh clause figures in the revenue claim and the damages award to Kansas City.

In September 1998, Thoroughbred filed a declaration of unitization with the Comanche County Register of Deeds combining the OXY lease with others in that area as the Rietzke Unit. The declaration reports Thoroughbred drilled a test well that produced gas "in paying quantities" and represents the leases have been unitized "as to the gas rights" and for the purpose of "promot[ing] the conservation of gas . . . that may be produced" from the combined tracts. The well on the Rietzke Unit produced from the Marmaton-Altamont interval or geological stratum.

Kansas City acquired its ownership interest in the minerals in the tract covered by the OXY lease in the summer of 1999. Between August 1999 and November 2001, Thoroughbred drilled four more wells on the Rietzke Unit and continued to produce gas from the adjacent Thoroughbred-Bird Unit. At least one of the wells on the Rietzke Unit produced below the Marmaton-Altamont interval. During that time, Kansas City representatives suggested the wells on the Thoroughbred-Bird Unit were draining gas from the Rietzke Unit, thereby diminishing the value of the company's oil and gas interests. They urged Thoroughbred to drill offset wells to protect Kansas City's rights. Thoroughbred did not. In addition, Kansas City sought well information that would show additional development of the Rietzke Unit and, thus, revenue due from any successful wells. Thoroughbred refused to provide that information, which would have shown the production from below the Marmaton-Altamont interval.

Thoroughbred, instead, filed suit against Kansas City in Comanche County in September 2002. In due course, Kansas City answered and counterclaimed. The pleadings in the case went through several amendments. We summarize them as they pertain to the issues on appeal. Thoroughbred sought a declaration that the OXY lease should not and could not have been included in the Rietzke Unit based on the unitization language in the written lease. The company requested an order removing the lease from the dec-

laration of unitization and requiring Kansas City to disgorge revenue it had received from the production of gas from the Rietzke Unit. After filing suit, Thoroughbred withheld payment of proceeds from production otherwise due Kansas City from the Rietzke Unit. The company did so without court authorization and simply as a self-help device. Advancing various legal and equitable theories, Kansas City counterclaimed for: (1) revenue due from the Rietzke Unit and from Thoroughbred's production of any gas below the Marmaton-Altamont interval; (2) relief from alleged drainage through the wells on the Thoroughbred-Bird Unit; (3) interest on the unpaid production proceeds; and (4) attorney fees.

Nearly a year into the litigation, Thoroughbred filed for summary judgment on its interpretation of the OXY lease's unitization language. The briefing was extensive. In its ruling denying the motion, the trial court suggested the lease to be ambiguous and found unresolved factual disputes regarding the well spacing requirements. In the meantime, discovery continued.

In April 2007, each side filed for summary judgment on various issues. As the first to file, Kansas City sought judgment that: (1) the OXY lease had been properly included in the Rietzke Unit; (2) the Pugh clause kept the lease in effect for only oil and gas taken from the surface to the Marmaton-Altamont interval; (3) the lease had lapsed below that interval; (4) the declaration of unitization remained in effect; and (5) Thoroughbred owed revenue payments to Kansas City for production. In its motion, Thoroughbred essentially renewed its earlier request for a summary determination that the written OXY lease agreement precluded inclusion of the tract in the Rietzke Unit and sought judgment on Kansas City's counterclaims as a matter of law.

In the dueling statements of facts prepared as part of the summary judgment briefing, the parties effectively agreed the OXY lease was granted to Thoroughbred based on a mutual understanding that it would be placed in the Rietzke Unit. Kansas City asserted as an uncontroverted statement of fact in support of its motion:

"At the time that OXY executed the Subject Lease, OXY was informed and believed that Thoroughbred intended to pool and unitize the Subject Lease with

the other lands and leases. OXY granted the Subject Lease with the intent that it be pooled into the 640 acre Rietzke Unit proposed by Thoroughbred."

Kansas City duly supported that factual assertion with an affidavit from Stephen S. Flynn, a land manager for OXY, USA, Inc. In response, Thoroughbred stated:

"It is uncontroverted that Steven Flynn has testified under oath that at the time OXY granted the Subject Lease, it believed that it would be unitized with other leases. Plaintiffs controvert the notion that that intent was evidenced in the language OXY, through its attorney and agent, Mr. Flynn, chose to place in paragraph 4 of the Subject Lease."

On July 30, 2007, the trial court orally ruled in favor of Kansas City on its summary judgment motion and, thus, against Thoroughbred, since its position depended upon a countervailing interpretation of the OXY lease. Left for trial were Kansas City's drainage claim and the determination of its damages for the withheld revenues from the Rietzke Unit attributable to the OXY lease and any production below the Marmaton-Altamont interval. The district court also had not ruled on Kansas City's requests for prejudgment interest and attorney fees. On December 19, 2007, the trial court signed a journal entry confirming the summary judgment rulings. At Thoroughbred's request, the trial court certified the summary judgment determinations for interlocutory appellate review. Thoroughbred asked this court to examine those rulings. That invitation was declined in favor of considering all claims of error in a single appeal at the conclusion of the litigation in the district court. In the meantime, based on the summary judgment rulings, the parties stipulated to a calculation of the revenue due Kansas City from Thoroughbred's production of oil and gas.

The district court conducted a 1-day bench trial on September 8, 2008, on Kansas City's claim that Thoroughbred had improperly drained the Rietzke Unit through the wells it drilled on the Thoroughbred-Bird Unit. At trial, Kansas City presented testimony from Robert Blair, the company's chief executive officer, as to its acquisition of the mineral interests from OXY, USA, Inc., and his communication with Thoroughbred about drainage from the Rietzke Unit. Kansas City also presented expert testimony from a

petroleum geologist and a petroleum engineer who concluded that the production from the Thoroughbred-Bird Unit drew oil and gas from the Rietzke Unit. Thoroughbred countered at trial with similarly credentialed experts—an engineer and a geologist—who testified that they determined no drainage had occurred. Thoroughbred executive and co-owner Robert Patton testified about the company's development of the leases in that part of Comanche County. All of the experts anchored their opinions with geological studies, production data, and other information.

After receiving proposed findings of fact and conclusions of law from the parties, the trial court entered a written decision and journal entry of judgment on April 27, 2009, detailing the course of the litigation and addressing the unresolved issues. The trial court found that Kansas City had failed to prove that the Rietzke Unit had sustained drainage from the Thoroughbred-Bird Unit. On the other remaining issues, the trial court held that Thoroughbred improperly withheld distribution of revenues from the Rietzke Unit to Kansas City and that the dollar amount was reasonably ascertainable entitling Kansas City to prejudgment interest under K.S.A. 55-1615. The trial court also found Kansas City to be a prevailing party on the revenue payment issue permitting an award of attorney fees under K.S.A. 55-1617.

Kansas City submitted a documented fee request for $290,662.50. Thoroughbred did not contest the hourly rates or the reasonableness of the time spent on the work reflected in the billing records. But the company challenged the overall amount of the request because much of the time was devoted to the drainage issue. The trial court apportioned two-thirds of the requested time to the drainage dispute and awarded Kansas City $96,878 in attorney fees, reflecting one-third of its request. In a supplemental order entered on August 10, 2009, the trial court awarded Kansas City $370,340.61 for revenue Thoroughbred had wrongfully withheld from production proceeds attributable to the Rietzke Unit and for production below the Marmaton-Altamont interval. That figure was computed as of May 1, 2009, according to the order. The court also found that as of April 27, 2009, prejudgment interest on that amount totaled $107,202.34.

As we indicated earlier, the parties have appealed or cross-appealed virtually all of the trial court's rulings outlined here. We supplement the factual and procedural history of the case as necessary for a comprehensible discussion of each of those appellate issues.

*Summary judgment issues on appeal*

The standards governing summary judgment are well settled and often recited. We need not linger over them here. A party seeking summary judgment has the obligation to show, based on appropriate evidentiary materials, that there are no disputed issues of material fact and that judgment may, therefore, be entered in its favor as a matter of law. *Shamberg, Johnson & Bergman, Chtd. v. Oliver*, 289 Kan. 891, 900, 220 P.3d 333 (2009); *Korytkowski v. City of Ottawa*, 283 Kan. 122, Syl. ¶ 1, 152 P.3d 53 (2007). In essence, the movant argues there is nothing for a jury or a trial judge sitting as factfinder to decide that would make any difference. The party opposing summary judgment must then point to evidence calling into question a material factual representation made in support of the motion. *Shamberg*, 289 Kan. at 900; *Korytkowski*, 283 Kan. 122, Syl. ¶ 1. If the opposing party does so, the motion should be denied so a factfinder may resolve that dispute.

In addressing a request for summary judgment, the trial court must view the evidence most favorably to the party opposing the motion and give that party the benefit of every reasonable inference that might be drawn from the evidentiary record. *Shamberg*, 289 Kan. at 900. An appellate court applies the same standards on appeal. Even though parties file cross-motions seeking summary judgment on the same issue, the trial judge is neither obligated nor permitted to grant one or the other simply because each side had asked the court to do so. *Wheeler v. Rolling Door Co.*, 33 Kan. App. 2d 787, Syl. ¶ 1, 109 P.3d 1255 (2005). Rather, the court must independently consider each motion to determine if it should be granted or denied applying the usual standards of review. 33 Kan. App. 2d 787, Syl. ¶ 1.

Thoroughbred contends the trial court erred in granting summary judgment to Kansas City on the issue of the terms governing

unitization of the OXY lease. Thoroughbred essentially argues the written lease provision should be enforced even though everyone acknowledges its language does not reflect what was negotiated and agreed upon regarding unitization. We find no support in the law for that proposition.

At the risk of unnecessarily stating the obvious, we note that oil and gas leases are contractual in nature and the general rules of contract law and interpretation apply to them. *Davis v. Key Gas Corp.*, 34 Kan. App. 2d 728, Syl. ¶ 3, 124 P.3d 96, *rev. denied* 281 Kan. 1377 (2006) ("The rules governing the construction of oil and gas leases are well established and follow the rules for construction of contracts generally."); *Lauck Oil Co. v. Breitenbach*, 20 Kan. App. 2d 877, 878, 893 P.2d 286 (1995). Thoroughbred runs through the common litany of cases recognizing that unambiguous written contracts should be enforced based on their plain language. See, *e.g., Liggatt v. Employers Mut. Casualty Co.*, 273 Kan. 915, 921, 46 P.3d 1120 (2002) ("If the terms of the contract are clear, there is no room for rules of construction, and the intent of the parties is determined from the contract itself."). But that authority speaks to a proposition different from the one presented here. The issue here is whether the written words, in the first instance, embody the bargain the parties struck. That has nothing to do with the clarity or ambiguity of the words or the sentences and paragraphs they construct. If they do not define the agreement, they are irrelevant. Only if they actually state the agreement, do we attempt to parse their meaning.

A court, however, may reform a written contract so that the true agreement between the parties is given effect over the incorrect words on paper. *Conner v. Koch Oil Co.*, 245 Kan. 250, 254, 777 P.2d 821 (1989) (recognizing and applying equitable remedy of reformation when a contract or other document fails to set forth accurately the intentions of the parties); *Schlatter v. Ibarra*, 218 Kan. 67, 70, 542 P.2d 710 (1975) ("[E]arly in [its] history," Kansas embraced the equitable principle that a document intended to memorialize an agreement "could be reformed to conform to the original intention of all parties to the instrument, where a mutual mistake was made" in setting forth the provisions of that agreement

in writing.); *In re Marriage of Jones*, 22 Kan. App. 2d 753, 761-62, 921 P.2d 839, *rev. denied* 260 Kan. 993 (1996). Commonly one party suggests the agreement was A, B, C, and D, while the other says no, it was C, D, E, and F. The court, then, must resolve that conflict. And typically that requires credibility determinations and factfinding inappropriate for summary judgment. Here, however, the issue has been presented in an atypical scenario. The uncontroverted facts submitted to the trial court show that the parties negotiating the lease fully intended the tract to be placed in the Rietzke Unit. As we noted earlier, Kansas City set forth properly supported facts in its summary judgment papers to that effect. Thoroughbred, in its response, did not controvert the substance of those factual representations. Instead, it simply stated the lease, as written, controls and should be enforced.

The lease document, then, contains a limited unitization provision inconsistent with the parties' negotiations and agreement. (Counsel for both sides confirmed that reading of the record at oral argument.) Because the material facts were undisputed, the trial court properly could resolve the issue on summary judgment. The circumstances were also atypical in that one might commonly expect that if both parties to a contract acknowledge that the written instrument failed to capture their true understanding, they would willingly and readily fix the problem themselves. But Thoroughbred, instead, determined its interests would be best served by trying to enforce the document and not the actual negotiated agreement. That effort, however, must fail.

The essence of contract law lies in regulating how parties may make legally enforceable agreements and in providing mechanisms for enforcing those agreements when disputes arise over the interlocking rights and obligations so created. Reformation is a well-accepted tool for accomplishing the goals underlying contract law, and its application is appropriate here as to the oil and gas lease and the understanding of the parties regarding unitization. Thoroughbred has offered no sound reason why the true understanding of the parties should be supplanted by an inaccurate document. We, therefore, find that the actual agreement called for the inclu-

sion of the tract in the Rietzke Unit. The trial court properly granted summary judgment to Kansas City on that issue.

Thoroughbred also argues that the OXY lease could not have been included in the Rietzke Unit based on equitable estoppel principles. In light of our decision, we need not consider that argument.

Thoroughbred contends the trial court erred in granting summary judgment to Kansas City regarding the effect of the Pugh clause in the oil and gas lease on the parties' interests in the tract covered by the OXY lease. The trial court found that Thoroughbred had produced oil and gas from the Marmaton-Altamont interval in the Rietzke Unit during the term of the OXY lease, thereby continuing the lease by production to that stratum. Thoroughbred does not quarrel with that conclusion assuming that the OXY lease could have been included in the unit at all. The court, then, necessarily found that the lease expired at the end of the original term as to any mineral interests below the Marmaton-Altamont interval. That is precisely what the Pugh clause was intended to do. Again, Thoroughbred does not dispute that reading of the clause.

A Pugh clause restricts the extent to which drilling a producing well within a unit perpetuates a lease included in the unit. *Sandefer Oil & Gas, Inc. v. Duhon*, 961 F.2d 1207, 1209 (5th Cir. 1992) ("The main purpose of any Pugh clause is to protect the lessor from the anomaly of having the entire property held under a lease by production from a very small portion."). The provision derives its name from that of Louisiana lawyer Lawrence G. Pugh, Sr., who purportedly originated the device some 60 years ago. See 961 F.2d at 1208 n.1. A Pugh clause can limit unitization "vertically" or "horizontally" or both. See *Rogers v. Westhoma Oil Company*, 291 F.2d 726, 731-32 (10th Cir. 1961). A vertical Pugh clause commonly provides that if a portion of a lease is included in a unit, only that portion will be held by production from elsewhere in the unit. *Kysar v. Amoco Production Co.*, 135 N.M. 767, 774, 93 P.3d 1272 (2004) (describing operation of vertical Pugh clause). A horizontal Pugh clause, as in this case, holds a lease only to the stratum or level from which production has been secured in the unit during the primary term of the lease and, thus, frees the mineral interests

below that depth absent additional development. *Sandefer Oil & Gas*, 961 F.2d at 1210-11; *Rogers*, 291 F.2d at 733-34.

While acknowledging the purpose of Pugh clauses generally and the efficacy of the one in the OXY lease, Thoroughbred does take issue with the trial court's conclusion that, as a result of the clause, Kansas City held a working interest as to production from the Rietzke Unit below the Marmaton-Altamont interval. The trial court concluded that Kansas City had a .0625 working interest and a .0625 net revenue interest in that production from the Rietzke Unit. (The court based that determination on an 8/8ths or full unleased interest on 40 acres in the 640 acre unit.) Thoroughbred does not suggest what interest Kansas City did have in that productiononly that it wasn't the working interest the trial court defined.

By virtue of the Pugh clause, Thoroughbred's lease interest below the Marmaton-Altamont interval had lapsed. Thoroughbred, therefore, was effectively extracting oil and gas from the tract covered by the OXY lease below the Marmaton-Altamont interval without having any lease rights from Kansas City to do so. In *Krug v. Krug*, 5 Kan. App. 2d 426, 431, 618 P.2d 323 (1980), *rev. denied* 229 Kan. 670 (1981), this court endorsed the approach the trial court used here in finding Kansas City should be treated as having a working interest. In *Krug*, a party holding a small fractional interest in the mineral rights on a given tract declined to enter into a lease. The persons holding the balance of the mineral rights gave leases to Cities Service Petroleum Company and sued for a declaration allowing the company to drill wells. The trial court granted that relief and directed that the owner of the unleased interests be treated as having a working interest to be burdened with expenses only for successful wells. This court found the arrangement to be a proper way of handling the unleased interests. 5 Kan. App. 2d at 431. In this case, the trial court reasonably took the same approach in a comparable circumstance insofar as Thoroughbred had extracted gas without lease rights from Kansas City. We find no error.

As we noted, after the summary judgment rulings, the parties stipulated as to the production revenues from the Rietzke Unit attributable to Kansas City's interests. The bulk of revenue came

from the production of gas, but some was from oil. Thoroughbred argues that the trial court erred as a matter of law in including the oil revenue because the declaration of unitization pertained only to "gas rights" in the covered tracts. Thoroughbred bases its argument solely on the language of the agreement.

But the Kansas Supreme Court has recognized that oil or other hydrocarbons extracted as incidental byproducts should be treated as part of the production from a unit formed only for gas exploration. *Skelly Oil Co. v. Savage*, 202 Kan. 239, 249, 447 P.2d 395 (1968). And proceeds from the sale of the byproducts should be paid on a ratable basis to the owners of the unitized interests. 202 Kan. at 249. In *Skelly Oil*, the unitization agreement pertained to "gas rights only," as does the declaration at issue here. 202 Kan. at 239. The well in that case produced gas and liquid hydrocarbons. Finding only "scant" authority on how the liquid hydrocarbons should be treated, 202 Kan. at 243, the court reviewed secondary sources and analogous case law to conclude that revenue from hydrocarbons extracted as "a constituent element of the gas produced" should be distributed proportionately to the parties having interests in the gas unit when the unitization agreement itself addressed "gas rights" without some limiting language, 202 Kan. at 248-49. Here, the declaration of unitization contains the same "gas rights" phrase without any elaboration as to the treatment of incidental production of oil or other hydrocarbons. Accordingly, the reasoning and result in *Skelly Oil* control here. The trial court properly included revenue from nongas production in determining the amount due Kansas City.

*The trial: Drainage or not?*

Kansas City cross-appeals the trial court's ruling rejecting its drainage claim. The trial court sat as the factfinder in the 1-day bench trial. Kansas City argues that the court should have placed the burden of proof on Thoroughbred on the drainage claim. Typically, of course, a counterclaiming defendant, such as Kansas City, would bear the burden of proof on its counterclaim, since it stands in the posture of a plaintiff bringing suit with regard to that cause of action. See *Packer Co. v. Packer Co.*, 111 Kan. 52, 54, 205 P.

1018 (1922). Kansas City, however, submits the common rule should not apply here because Thoroughbred held leases on both the property purportedly being drained and the property on which the draining wells had been sunk. As a result, says Kansas City, Thoroughbred had engaging in a form of self-dealing to the detriment of Kansas City. In those circumstances, Kansas City contends better reasoned oil and gas law would require Thoroughbred to justify its failure to drill offset wells. Kansas City's argument is, at best, overly simplistic. Kansas City also faces procedural hurdles of its own making; we address those barriers first.

At the start of the bench trial, Kansas City acknowledged it stood in the posture of a plaintiff on the counterclaim. At that time, Kansas City did not assert any argument that the burden of proof should have been allocated in anything other than the common manner. Moreover, Kansas City presented its evidence first, with Thoroughbred responding, as would a defendant. If the burden of proof were reversed, Thoroughbred actually should have presented its case before Kansas City. It is a legal saw that the party bearing the burden of proof goes first. *C.I.T. Corporation v. Forster*, 156 Kan. 304, 306, 133 P.2d 129 (1943) ("In harmony with the general rule in civil actions[,] the plaintiff in a replevin action must establish his title and right to possession by a preponderance of the evidence."); *Spurgeon v. Union National Bank*, 137 Kan. 98, 99, 19 P.2d 459 (1933) (party assuming burden of proof opens and closes both the presentation of evidence and argument to the finder of fact); *Coon v. Railway Co.*, 75 Kan. 282, 284, 89 P. 682 (1907) (Characterizing the practice as "long before recognized," the court stated: "[I]t is a rule necessary to an orderly trial of the issues in a case that the party upon whom rests the burden of the issues shall first produce his evidence . . . before the opposing party is allowed to produce any evidence."). Without flagging some different understanding, Kansas City effectively led the trial judge to assume the customary application of the burden of proof governed.

Kansas City only compounded that confusion in presenting proposed findings of fact and conclusions of law to the trial court. In its submission, Thoroughbred stated Kansas City bore the burden of proof on the drainage issue. In its response, Kansas City took

issue with various of Thoroughbred's proposed statements, but the burden of proof was not among them. In short, Kansas City acquiesced in that representation to the trial court. In turn, of course, the trial court properly and justifiably accepted the undisputed statement of how the burden of proof fell and shaped its ruling accordingly. Kansas City cannot now complain of what it accepted at the trial level. *Spurgeon*, 137 Kan. 98, Syl. ¶ 1 ("In the trial of a civil action . . . a party who assumes the burden of proof, without objection, and makes no contention in the trial court that the court erred in placing the burden of proof on him, in not in position to raise that question for the first time in [the appellate] court."). See *Butler County R.W.D. No. 8 v. Yates*, 275 Kan. 291, 296, 64 P.3d 357 (2003) (A party may not take a position in the trial court and then urge that position as error on appeal.). That is a form of invited error. Although Kansas City did not affirmatively assert a position on the burden of proof, it declined to dispute Thoroughbred's representation on the point, and its conduct during the bench trial was consistent with that representation. See *In re Care & Treatment of Miller*, 289 Kan. 218, 224-25, 210 P.3d 625 (2009) (An issue "not raised before the district court cannot be raised on appeal.").

Even if we were to consider Kansas City's substantive argument for shifting the burden of proof to Thoroughbred, we would not reverse. Kansas City overextends the case law it presents. The authority the company cites essentially recognizes that *if* drainage has taken place and the same lessee holds the development rights on the land being drained and the property from which the oil or gas has been removed, the lessee bears the burden of proving it acted prudently in declining to take additional steps to protect the owner of the land being drained, as by putting in an offset well. Those courts, however, require the owner claiming harm to prove that drainage has, in fact, occurred before shifting the burden to the lessee to justify its actions. *Central Ky. Natural Gas Co. v. Williams*, 249 Ky. 242, 249, 60 S.W.2d 580 (1933) ("[I]t is incumbent upon the lessor to allege and prove that the lessee . . . by negligence permits the drainage"[;] and if the lessee operates the adjoining land and sinks a well close to the property line, it may be liable for

damages for drainage for the unexplained failure to sink a com-parable well on the lessor's tract.); *Dixon v., Anadarko Production Company*, 505 P.2d 1395, 1396 (Okla. 1972) (if lessor presents evidence at trial showing drainage and lessee holds development rights to lessor's tract and tract from which drainage occurring, lessee "should be required to go forward with evidence as to why it has not drilled" appropriate wells to protect lessor); *Haken v. Harper Oil Co.*, 600 P.2d 1227, 1231 n.1 (Okla. App. 1979) (once lessor "shows some drainage," burden shifts to lessee holding rights to that tract and draining tract to prove a prudent operator would not drill offset well or to prove drainage is negligible); *Dillard v. Gas Co.*, 114 W. Va. 684, 689, 173 S.E. 573 (1933). That shifting burden contrasts with usual prudent-operator rule under which an owner claiming drainage must prove both the drainage and that the lessee with development rights has failed to take reasonable steps to prevent the loss. In the typical case, however, one operator has drilled the wells causing the drainage and another operator holds the development rights to the property being drained. In that circumstance, both operators presumably would be motivated by economic interests to act "prudently" in developing their respec-tive leaseholds. The law, therefore, places the burden on the land-owner to prove a deviation from what a prudent operator would reasonably do in developing a lease.

Kansas has long recognized the prudent-operator rule. See K.S.A. 55-223; *Parkin v. Kansas Corporation Comm'n*, 234 Kan. 994, 1009, 677 P.2d 991 (1984) (noting the prudent-operator rule or test to be of longstanding in Kansas and citing numerous cases recognizing it); *Rush v. King Oil Co.*, 220 Kan. 616, Syl. ¶ 3, 556 P.2d 431 (1976). Essentially, a lessee must take those steps a pru-dent operator would employ to develop the oil and gas interests "for the common advantage of both lessor and lessee." *Rush*, 220 Kan. 616, Syl. ¶ 3. Given the often large expense in exploration and development, the lessee may be justified in exercising caution in satisfying that undertaking. 220 Kan. at 619. At the same time, an operator has a duty to take reasonable steps to protect against drainage from adjoining properties. 220 Kan. at 618. Those steps will be shaped by the projected amount of oil or gas, anticipated

market prices, development of nearby tracts and potential drainage, and the cost of drilling and operating a well. 220 Kan. at 619. The prudent-operator rule applies to the development of both individual tracts and unitized leases. *Parkin*, 234 Kan. at 1009. Given the issue presented here, we need not plumb the full intricacies of covenants of development and the prudent-operator rule. The Kansas courts, however, apparently have never had occasion to consider whether the rule should be modified when the same operator purportedly has drained property it has leased using wells it has sunk on an adjacent property it has also leased. The parties have directed us to no such authority, and we have found none.

Here, Kansas City failed in its proof of the necessary predicate-that drainage was occurring at all. The trial court heard an array of experts and received a squall, if not a blizzard, of documents on the drainage issue. The testimony and the paper from each side presented starkly contrasting pictures, one depicting drainage and the other not. The trial court, as the factfinder, weighed that conflicting evidence and concluded Kansas City failed to show that drainage was more probably occurring than not. Even under the authority Kansas City says should control, it would have had to prove drainage. Only then would Thoroughbred have been required to explain or prove its development of the leases to have been reasonable. The trial court found Kansas City's evidence wanting on drainage. That ends the matter. *Hodges v. Johnson*, 288 Kan. 56, Syl. ¶ 7, 199 P.3d 1251 (2009) (An appellate court reviews a trial judge's findings of fact only to determine if they are supported by competent evidence and will not make credibility determinations or reweigh conflicting evidence.).

Lest we be misunderstood, we express no opinion here on whether the prudent-operator rule ought to be modified in some circumstance in which a lessee holds development rights on contiguous properties causing one of the owners to claim the lessee labors under conflicting interests and, therefore, has neglected appropriate exploration on one of the parcels. That issue has divided the courts considering it. This case, however, does not present us with an appropriate occasion to fill that apparent void in Kansas

law. We properly defer our consideration to a case that actually requires us to confront the issue.

*Wrapping up: Interest and attorney fees.*

The trial court awarded Kansas City prejudgment interest on the revenues Thoroughbred withheld from production on the Rietzke Unit. The trial court also found Kansas City to be entitled to attorney fees for its legal efforts to secure those funds. The trial court based its ruling on the Interest On Proceeds From Production Act, K.S.A. 55-1614 *et seq.* The Act is aimed at curtailing sharp practices in the oil and gas industry where a purchaser refuses to make timely payment for petrochemicals to the owners of the mineral interests. The Act applies only to the "first sale" of the oil or gas, rather than downstream transactions. If a party has to sue to obtain payment on a first sale, it may recover interest on the amount due, K.S.A. 55-1615, and, in the court's discretion, reasonable attorney fees and court costs associated with the action, K.S.A. 55-1617. The legislature obviously intended the Act as a vehicle providing a make-whole remedy to owners of mineral interests from whom production revenue had been wrongfully withheld by shifting the cost of any litigation, including attorney fees, to the losing purchaser.

On appeal, Thoroughbred argues that Kansas City failed to state with sufficient particularity that it intended to seek relief under the Act for interest and attorney fees and, therefore, the trial court should not have included amounts for those items in the judgment. Thoroughbred does not argue the Act to be inapplicable as a matter of law to the circumstances of its business relationship with Kansas City litigated in this case. Nor does it challenge the dollar amounts the court allowed as interest or as attorney fees, assuming such awards to have been otherwise proper.

For its part, Kansas City contends the trial court erred in awarding only $96,878 in attorney fees on its request for $290,662.50. The trial court found that counsel for Kansas City devoted one-third of their time to the recovery of the withheld revenue and two-thirds of their time to the drainage issue and apportioned the fee award accordingly. Everyone agrees that K.S.A. 55-1617 would

not have afforded a basis for granting attorney fees on the drainage claim even if Kansas City had prevailed.

We first address Thoroughbred's contentions. In the amended answer and counterclaim to Thoroughbred's second amended petition, Kansas City specifically requested prejudgment interest and attorney fees as part of the relief sought. In that pleading, Kansas City also specifically alleged Thoroughbred failed to pay all of the production revenue due it from the Rietzke Unit and requested an accounting and payment of those amounts. But Kansas City did not mention the Act or cite either K.S.A. 55-1615 or K.S.A. 55-1617. Thoroughbred argues that such general pleading fails to establish or preserve any claim for relief under the Act. We disagree.

The purpose of a petition or, as in this instance, a counterclaim is to put the party against whom relief is sought on notice of the nature of the claim. The pleading need not (and, indeed should not) be an elaborate recitation of detailed factual allegations interspersed with citations to cases or statutory authority. Rather, under K.S.A. 60-208, a pleading "shall contain . . . [a] short and plain statement of the claim showing that the pleader is entitled to relief . . . and . . . a demand for judgment for relief" the pleader seeks on the claim. See *Berry v. National Medical Services, Inc.*, 41 Kan. App. 2d. 612, Syl. ¶¶ 1, 2, 205 P.3d 745 (2009), *rev. granted on other grounds* 289 Kan. 1277 (2010) (review pending).

Kansas City's counterclaim, as outlined in its responsive pleading to the second amended petition, satisfied that statutory requirement. Thoroughbred had notice that Kansas City was seeking production revenue it claimed had been wrongfully withheld along with interest and attorney fees. While the counterclaim could have been more explicit about the legal basis for the requested interest and attorney fees, that degree of specificity or clarity was not required in an opening pleading.

To the extent Thoroughbred desired more detail about Kansas City's requested relief, it could have propounded an interrogatory asking for the statutory or other legal authority for an award of either prejudgment interest or attorney fees. See K.S.A. 60-233(c) (An interrogatory may require an answer entailing "the application of law to fact."). Likewise, Thoroughbred could have raised the

issue at a case management conference or a pretrial conference and requested counsel for Kansas City to detail the legal grounds for the relief. See K.S.A. 60-216(b)(1), (c)(1), (2), and (7). Thoroughbred had ample time to pursue those means of inquiry. Kansas City's amended answer and counterclaim was filed July 10, 2003. We discern no prejudice to Thoroughbred, and the company details none in its appellate briefing.

As to the award of prejudgment interest, Thoroughbred advances additional arguments premised on the inapplicability of K.S.A. 55-1615. Because we find that the trial court properly relied on that statute, we need not consider those alternative contentions.

On the attorney fee issue, Thoroughbred additionally suggests that the award was improper because its conduct regarding the payment of production proceeds to Kansas City was neither undertaken in bad faith nor unreasonable. The argument fails for several reasons. We suppose for purposes of considering the proposition that the company acted reasonably and without ill will. (In making that assumption, we do not mean to imply that *counsel* for Thoroughbred may have been indecorous. From our perspective, counsel for both sides have conducted themselves professionally.)

Under K.S.A. 55-1617, a trial court, acting in its "discretion," may award reasonable attorney fees to the prevailing party in a payment dispute. The statute says nothing about bad faith or unreasonableness as a necessary condition for allowing attorney fees. While contumaciousness or other ill-spirited behavior by the losing party might push a court toward granting fees, the statute does not require that sort of conduct. In that respect, the statute really operates more in the nature of a strict liability remedy. That is, if a purchaser fails to pay over oil and gas revenue, the court ought to grant the payee its attorney fees absent some compelling reason otherwise. As we noted, the Act aims to make an owner of mineral interests whole if it has to sue to recover money due from the sale of oil or gas. And, in turn, the Act removes economic incentives for the seller to withhold payment or to negotiate a lesser amount using litigation costs as a bargaining chip. Accordingly, we reject Thoroughbred's argument that the statute contains some invisible clause requiring bad faith as a gateway to the recovery of attorney

fees. See *Unruh v. Purina Mills*, 289 Kan. 1185, 1200-01, 221 P.3d 1130 (2009) (The Kansas Supreme Court rejects an argument that attorney fees may be awarded under the Kansas Consumer Protection Act, K.S.A. 50-623 *et seq.*, only when the losing party's conduct evinces bad faith, since the statutory language neither contains such a requirement nor affords any reasoned basis to infer one.).

Given the statutory language of K.S.A. 55-1617, we simply ask whether the trial court abused its discretion in finding an award of attorney fees to be proper. (Here, there is no question that the statute permits fees as a matter of law and defers their allowance in a given case to the court's discretion.) A trial court may be said to have abused its discretion only if the result is "arbitrary, fanciful, or unreasonable." *Unruh*, 289 Kan. at 1202. That is, no reasonable judicial officer would have come to the same conclusion if presented with the same record evidence. On the evidence, the trial court acted well within that broad latitude and in furtherance of the purposes of the Act in allowing attorney fees. As we noted, Thoroughbred unilaterally withheld revenue payments due Kansas City when the business relationship between them soured. That is more than enough to justify an award of attorney fees.

Thoroughbred does not otherwise challenge the computation of the attorney fees. It did not dispute the reasonableness of the hourly rates Kansas City's counsel used or the amount of time attributed to the various tasks for which the fees were requested.

Kansas City also cross-appeals the attorney fee award, taking issue with the trial court's determination to cut the request by two-thirds. In support of its fee request, Kansas City submitted to the trial court itemized billing records outlining the work performed, the attorney performing the work, the amount of time spent, the hourly rate, and a description of the work. The records fill nearly 75 pages. The billing records were accompanied by an affidavit from William J. Skepnek, one of the lawyers for Kansas City, generally explaining the materials and how they were prepared. Skepnek also outlined his lengthy legal career and offered his assessment that the rates charged and hours worked were reasonable. The billing records, however, do not, by and large, distinguish be-

tween work done on the drainage issue and work done on the failure-to-pay issue. Nothing else submitted to the trial court draws any such distinction. And Kansas City appears to have sought recovery for all of the attorney fees it incurred in this litigation. Some of the entries also included time for work done on a parallel suit litigated in federal court during at least part of the period the parties were battling in the Comanche County District Court.

The trial court correctly determined that counsel's work and the related fees attributable to the drainage claim should have been excluded from any fee award under K.S.A. 55-1617. The statute does not authorize fees for that sort of issue; nor did Kansas City prevail on the claim. Likewise, absent some detailed explanation, Kansas City should not have been reimbursed for attorney fees rung up in the federal litigation. In his affidavit, Skepnek informed the trial court that Kansas City filed the federal action and brought the same claims it asserted as counterclaims in this litigation. According to the affidavit, the federal court ultimately dismissed Kansas City's suit for lack of jurisdiction. As with the information Kansas City supplied regarding the attorneys' work done in this case, the affidavit fails to delineate what time in the federal case was devoted to the failure-to-pay claim. Nor does the affidavit explain how that effort in federal court materially advanced this litigation.

In the motion seeking attorney fees, Kansas City correctly cites *Johnson v. Westhoff Sand Co.*, 281 Kan. 930, 940-41, 135 P.3d 1127 (2006), as outlining the factors a trial court may consider in fashioning an award. The Kansas Supreme Court has borrowed the eight criteria set forth in Rule 1.5(a) (2010 Kan. Ct. R. Annot. 458) of the Kansas Rules of Professional Conduct used to determine if a given fee is "reasonable" and, therefore, ethically proper. 281 Kan. at 940-41. The criteria revolve around the time required, customary fees or rates for comparable legal services, constraints the litigation imposed on the lawyer in terms of deadlines or forgoing other work, the experience and skill of the lawyer, the nature of the on-going professional relationship (if any) between the lawyer and the client, the value of what was at stake in the case and the result obtained, and whether the fee arrangement was "fixed or contingent." 281 Kan. at 940-41; see Rule 1.5(a) (The factors in

Rule 1.5[a] remain unchanged from 2006, when *Johnson* was decided.).

When a party both prevails on a claim allowing attorney fees and either loses on claims that would have allowed fees or prevails on other claims that do not, a court should award fees based only on the time spent on the successful claim permitting them. *De-Spiegelaere v. Killion*, 24 Kan. App. 2d 542, Syl. ¶ 1, 947 P.2d 1039 (1997). When that happens, the party seeking fees must provide the court with an adequate basis to "segregate the work" for which fees may be allowed from the rest of the time billed to the client. 24 Kan. App. 2d at 542, Syl. ¶ 1. If the party can satisfactorily show that some work was essential to and intertwined with both claims that allow a fee and those that don't, a court may include the time for such tasks in an award. 24 Kan. App. 2d 542, Syl. ¶ 2.

The amount of a statutory fee award ultimately rests in the trial court's sound discretion. *Unruh*, 289 Kan. at 1200; *Johnson*, 281 Kan. at 940. Based on experience and knowledge of the legal profession, a trial judge is deemed to be an expert on attorney fees and may draw on that expertise in rendering an award in a particular case. 281 Kan. at 940. Although appellate judges have similar expertise, they should refrain from substituting their assessments of an appropriate fee award in given case for those of the trial judge. 281 Kan. at 940. There are practical considerations behind that rule. A trial judge typically has far more familiarity with a given case and the time and effort expended by counsel in the development and disposition of the litigation, especially at the district court level, than would an appellate panel reviewing for legal error. As a result, a trial judge is better positioned to make a well-informed determination on a fee request. This is such a case, particularly given the extensive proceedings in the trial court including multiple substantive motions and a bench trial.

The trial court's determination of a fee award is intended to be a comparatively streamlined process that should not result in extended satellite litigation. *Burlington v. Dague*, 505 U.S. 557, 566, 112 S. Ct. 2638, 120 L. Ed. 2d 449 (1992) (The process for determining attorney fees awards should cultivate "ready administrability" and curtail "burdensome satellite litigation."); see *United*

*States v. One Star Class Sloop Sailboat Built 1930*, 546 F.3d 26, 42 (1st Cir. 2008). To accomplish that goal, counsel for the party seeking fees are expected to furnish the court with detailed billing records and other materials from which the information necessary to a reasoned fee determination may be readily extracted. See *DeSpiegelaere*, 24 Kan. App. 2d 542, Syl. ¶ 1. They may also offer useful guidance to the court through supporting affidavits. Similarly, the losing party may provide briefing or affidavits illuminating any challenges to the proposed fee award.

Although Kansas City referred generally to *Johnson* and the criteria in Rule 1.5(a) in its fee submission, it did not offer a detailed discussion of each factor. For example, Kansas City submitted no information regarding the contractual arrangement with its counsel and did not base any argument for fees on its obligation being either fixed or contingent. The trial court, accordingly, simply did not and could not have taken that information into account. But no single factor is controlling or dispositive. See *Johnson*, 281 Kan. at 943.

As we noted, Thoroughbred did not dispute the hourly rates Kansas City used in making its fee request. Thoroughbred also declined to challenge the time the lawyers showed on the billing records for particular work. The company, however, objected to the fee award including time spent on the drainage claim and other work unrelated to the payment issue, assuming any fees should have been allowed at all.

The trial court apparently did not hold a hearing on the fee request or otherwise solicit any further input from the parties before rendering a decision apportioning the time between the failure-to-pay claim and the other work Kansas City's lawyers performed and then awarding a dollar amount. The trial court did not detail its reasoning in arriving at allocating one-third of the requested time to the failure-to-pay claim. We might have benefitted from some greater insight into the trial court's approach. Nonetheless, especially in light of the governing standard of review, we have been shown nothing suggesting the trial court abused its discretion in deciding the attorney fee issue, particularly as to the final amount awarded. The trial court could not have granted Kansas

City all of the fees it requested and had to make some division of time between the failure-to-pay claim and the rest of the litigation. Based on the information provided from the parties, principally Kansas City, the trial court made a reasoned decision based on its familiarity with the litigation. We certainly cannot say that result amounted to an abuse of discretion.

In its brief, Kansas City asks us to review the time records and to make an independent division of the time based on its appellate argument. But that argument essentially attempts to submit facts about the billing records and the course of the litigation that are not otherwise in or cited to the record and, thus, were not offered to the trial court. Appellate courts will not typically entertain such arguments. See *Frick v. City of Salina*, 290 Kan. 869, Syl. ¶ 11, 235 P.3d 1211 (2010) (Statements of fact in an appellate brief must be keyed to the record on appeal; any factual representation without such a reference may be disregarded.); *In re Care & Treatment of Miller*, 289 Kan. 218, 224-25, 210 P.3d 625 (2009) (new arguments not considered on appeal); Rules 6.02 (2010 Kan. Ct. R. Annot. 38); Rule 6.03 (2010 Kan. Ct. R. Annot. 43). We adhere to that rule. A party may not slip new facts into an appeal in the guise of argument. Even if we were disposed to analyze the time records, we could not come to a conclusion better reasoned than the trial court's precisely because most of entries fail to attribute the work to one claim or another.

We find no error in the trial court's handling of the requests for interest and attorney fees.

Affirmed.