NOT DESIGNATED FOR PUBLICATION

No. 120,291

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

MIGUEL A. PERALTA-DIAZ,
*Appellee*,

v.

JENNIFER ORTEGA,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; SETH L. RUNDLE, judge. Opinion filed February 7, 2020.
Affirmed.

*Charles A. O'Hara*, of O'Hara & O'Hara, LLC, of Wichita, for appellant.

*Richard A. Samaniego*, of Gibson Watson Marino LLC, of Wichita, for appellee.

Before ATCHESON, P.J., HILL and BUSER, JJ.

PER CURIAM:  Miguel A. Peralta-Diaz and Jennifer Ortega had shared residential custody of their daughter A.P. The child shuttled between their homes on a biweekly basis, although Peralta-Diaz lived in Wichita and Ortega lived in San Antonio. When A.P. reached school age, Peralta-Diaz filed a motion for primary residential custody because that schedule was no longer practical. Following an evidentiary hearing, the Sedgwick County District Court granted the motion, giving Peralta-Diaz primary residential custody. Ortega has appealed.

1

First, Ortega contends the district court should have recused and committed reversible error by not doing so. The appellate record shows the request was untimely and not warranted under the circumstances. Second, Ortega says the change in residential custody was not supported in the evidence. Given our standard of review and the district court's factual findings, including an explicit credibility determination against Ortega, the point warrants no relief.

Peralta-Diaz filed a motion with this court for an order requiring Ortega to pay his attorney fees associated with this appeal. The motion and the related affidavit fail to support the requested award.

We, therefore, affirm the district court's custody order and deny the motion for attorney fees.

FACTUAL AND PROCEDURAL HISTORY

Peralta-Diaz and Ortega are the biological parents of A.P., who was born in 2013. Peralta-Diaz and Ortega have never been married to each other. At all relevant times, Peralta-Diaz has lived in Kansas, and Ortega has lived in Texas. Neither of them is a United States citizen. Nobody disputes that Kansas is A.P.'s home state under the Uniform Child-Custody Jurisdiction and Enforcement Act, K.S.A. 2018 Supp. 23-37,101 et seq., so jurisdiction and venue properly lie with the district court.

This case comes before this court because Peralta-Diaz filed for primary residential custody of A.P. before she was to begin school in the fall of 2018. Ortega also requested primary residential custody for the same reason. The parents had been sharing equal custody for about two years. The district court held an evidentiary hearing to determine the issue of primary residential custody.

Some background information regarding the parents' custody arrangements is helpful in explaining the district court's ruling. The dispute revolves around their immigration status. When A.P. was a few months old, Ortega was arrested for a criminal theft charge, triggering immigration deportation proceedings against her. She misled authorities about the identity of A.P.'s father, causing the child to be placed temporarily in an orphanage. Peralta-Diaz learned what happened and established his paternity of A.P., and the district court granted him primary custody. After federal authorities released her, Ortega filed a motion seeking immediate custody of A.P. and visitation. The district court denied the motion because Ortega needed to establish she had a suitable home and was facing neither incarceration nor deportation.

Over the next few years, Ortega obtained permanent residency status in the United States. The parents' custody arrangement frequently changed as A.P. got older, but Peralta-Diaz retained primary residential custody for much of the time. The parents participated in Limited Case Management (LCM) twice over the course of these proceedings. The Limited Case Manager recommended Ortega become the primary residential parent both times. Ortega filed numerous motions to change the custody agreement to conform to those recommendations. Despite Ortega's stated concern that Peralta-Diaz was an undocumented alien subject to deportation at any time, the district court repeatedly ruled that this was not new information and was not a change in material circumstances justifying a switch in primary residential custody.

In December 2016, the district court ordered the parents to share residential custody, so each would have A.P. for two weeks every month. Ortega attempted to appeal this ruling, but the appeal was untimely. The shared custody arrangement continued until October 2017 when Peralta-Diaz was arrested on charges he possessed fraudulent immigration documents. Peralta-Diaz pled guilty to the charges and faced deportation. While federal authorities detained Peralta-Diaz, Ortega had primary residential custody in

3

Texas, but the district court ordered the parties to resume the two-week shared residency arrangement when Peralta-Diaz was released.

In April 2018, Peralta-Diaz filed a motion to modify residential custody because A.P. would be starting kindergarten in the fall, so the two-week arrangement would no longer be feasible. Peralta-Diaz argued he would like A.P. to go to school at the parish he attends because it would be an easy adjustment for A.P. Peralta-Diaz further argued he has a close relationship with A.P., as does the rest of his extended family in the Wichita area. Peralta-Diaz stated he was currently unemployed but awaiting approval of a work permit. Although Peralta-Diaz had an immigration hearing pending, his federal criminal case had been closed.

The district court held an evidentiary hearing over two days in late June 2018. The district court entered a temporary order on July 20 granting primary residential custody to Peralta-Diaz and granting Ortega parenting time in Kansas every other weekend. The district court issued a final ruling in a journal entry filed on August 23. As stated in the journal entry, the district court found Ortega's testimony not credible in light of all of the evidence. The district court found that before Peralta-Diaz was arrested for using fraudulent identity papers, he worked for the same construction company for 12 years. Aside from being convicted of the document fraud, the district court did not have any negative information about Peralta-Diaz' conduct in the United States and no one presented evidence to suggest anyone was harmed by Peralta-Diaz' employment. Although Ortega testified she wanted Peralta-Diaz to have a good relationship with A.P., the district court concluded the circumstances showed she helped set in motion the events culminating in Peralta-Diaz' arrest and prosecution. The district court found Ortega was acting contrary to A.P.'s best interests by failing to foster and respect the bond between the child and Peralta-Diaz—a statutory factor to be considered.

4

The district court also stated it would have reached the same conclusion about primary custody even if Ortega was not involved in Peralta-Diaz' arrest. The district court noted that Peralta-Diaz worked continually in a legitimate enterprise to the good of his family and the community but Ortega's employment and income were suspicious. Ortega testified she cleans houses and works only 26 weeks out of the year—the weeks when she did not have parenting time with A.P. Ortega submitted various statements about her income, but the district court found they were irreconcilable with the money Ortega testified to earning. The district court also considered Ortega's past conviction for stealing clothing and stated that some of the unexplained income might be attributable to black market dealings.

The parties also presented testimony about whether Ortega actually had family in Texas. Despite Ortega's contention that she has a large family in Texas, Peralta-Diaz testified he had never seen any of Ortega's family members other than her brother. Again, the district court found Peralta-Diaz more credible in his testimony and that Ortega was not a credible witness. Peralta-Diaz' family is close physically and emotionally, whereas Ortega's extended family situation is unclear except that Ortega has an adult son with disabilities who lives with her.

Ultimately, the district court awarded primary residential custody to Peralta-Diaz and identified eight factors in K.S.A. 2018 Supp. 23-3203(a) in support of that decision. The district court found none of the statutory factors favored granting primary residential custody to Ortega. The district court stated: "The circumstances boil down to this: the Court cannot find any of [M]other's representations about what is going on in San Antonio reliable. There is virtually no independently verified information about who she is associating with there." Additionally, the district court found Ortega's dishonesty and deception had a real life impact on A.P., when, for example, the child was left without a caretaker following Ortega's arrest on theft charges.

Although there were concerns about immigration and deportation, the district court stated that helping a parent stay in the country should not be the driving force in making a child custody decision. The district court concluded:

"This case is not a case of all other things being equal, but the Court nevertheless does consider this non-enumerated factor in this decision. Independent of the immigration cases, the Court has a high level of security of placing the child primarily in Wichita with her father and father's extended family, and a low level of security with placing the minor child primarily with Ortega in San Antonio."

Three days after the district court entered the temporary order granting primary residential custody to Peralta-Diaz, Ortega filed a motion for a new trial or to amend the judgment arguing that the district judge was not impartial. In the motion, Ortega alleged, among other things, the judge indicated that he was "'leaning toward placing primary custody with [Peralta-Diaz]'" at the pretrial conference. Ortega argued the judge was impermissibly favoring granting Peralta-Diaz primary custody to stave off his deportation and ostensibly promoting A.P.'s best interests in having both parents in comparatively close geographic proximity to her. The district court denied the motion, and the chief judge of the Sedgwick County District Court took the matter up for review.

The chief judge also denied the disqualification request. The chief judge considered the judge's comments in context with the rest of the affidavit and oral arguments made at the pretrial conference. The chief judge found the statement appeared to be "more an effort to focus the arguments of counsel on an issue the judge considered to be preeminent rather than musing on the fact that he had already decided the case." Ortega filed another motion to alter or amend the judgment, but the district court again denied the motion. Ortega duly filed a notice of appeal challenging the district court's final decision granting primary residential custody to Peralta-Diaz.

6

LEGAL ANALYSIS

*Denial of Motion for Recusal or Disqualification*

Our standard of review provides: Appellate courts have unlimited review over allegations of judicial misconduct. *State v. Moyer*, 306 Kan. 342, 369-70, 410 P.3d 71 (2017) (unlimited review over whether a trial court judge's recusal is required); *State v. Robinson*, 293 Kan. 1002, 1032, 270 P.3d 1183 (2012) (unlimited review in evaluating an affidavit in support of a motion for recusal filed under K.S.A. 20-311d). An allegation of judicial misconduct is reviewable on appeal despite the lack of a contemporaneous objection when a party claims that his or her right to a fair trial was violated. *State v. Kemble*, 291 Kan. 109, 113, 238 P.3d 251 (2010).

When reviewing the legal sufficiency of an affidavit in support of a motion for a change of judge, the appellate court must decide the sufficiency of the affidavit, not the truth of the facts alleged. The appellate court should determine whether the affidavit provides facts and reasons pertaining to the party or the attorney that, if true, give fair support for a well-grounded, objectively reasonable belief the party will not receive a fair hearing with the assigned judge. *Robinson*, 293 Kan. at 1032.

On appeal, Ortega argues that she complied with the requirements of K.S.A. 20-311d(c)(5) in requesting recusal. More specifically, Ortega takes issue with the chief judge's decision to deny the motion by considering the allegedly prejudicial comments in context rather than as an abstract statement shorn of the surrounding circumstances. Ortega argues that if a judge made the statement that he or she is leaning toward one party before the hearing for any reason, he or she should be disqualified.

Conversely, Peralta-Diaz argues that Ortega's motion for recusal was untimely because it was filed after the trial but before the district court rendered its findings of fact

7

and conclusions of law. Peralta-Diaz asserts K.S.A. 20-311d(a) required Ortega to file the motion for a change of judge within seven days after the pretrial conference where the purportedly offending comments were made. Further, Peralta-Diaz contends the judge's statements during the pretrial conference were within the court's purview for considering pretrial matters and, therefore, do not convey bias or prejudice. Peralta-Diaz also contends that any error was harmless because Ortega had an opportunity to be heard during the two-day trial and had ample time to request the judge's recusal before the trial.

Although both parties cite to a two-prong test for recusal, it appears that test applies when the recusal request is brought under the Due Process Clause. See *Moyer*, 306 Kan. at 375-76; *State v. Sawyer*, 297 Kan. 902, 909, 305 P.3d 608 (2013). In contrast, both parties argue for or against recusal on a statutory basis under K.S.A. 20-311d.

Under K.S.A. 20-311d(a) and (b), when a judge refuses to disqualify himself or herself, the party seeking a change of judge may file an affidavit with the chief judge. The chief judge shall then determine the legal sufficiency of the affidavit. K.S.A. 20-311d(c) then outlines the specific grounds on which a party may request recusal. Here, Ortega relies on (c)(5):

> "The party or the party's attorney filing the affidavit has cause to believe and does believe that on account of the personal bias, prejudice or interest of the judge such party cannot obtain a fair and impartial trial or fair and impartial enforcement of post-judgment remedies. Such affidavit shall state the facts and the reasons for the belief that bias, prejudice or an interest exists."

Ortega first brought her grievance regarding impartiality to the judge who presided over the parental custody hearing through a motion for new trial or to amend the judgment. The district judge denied the motion for relief and explained his comment regarding leaning towards Peralta-Diaz' position during the pretrial conference. There

8

was no transcript of the pretrial conference, but the trial judge admitted to making the comment during a conversation with both parties in his chambers. The judge explained the parties had a conversation regarding Peralta-Diaz' immigration status. But Peralta-Diaz' immigration status came to the court's attention because Ortega hired an immigration attorney to be an expert witness at trial. The expert witness wrote a report explaining her opinions on how Peralta-Diaz' immigration status could be affected by which parent had custody of the child.

The judge further explained that because Ortega's counsel wanted to call the expert during the evidentiary hearing, he asked the lawyers for both parties whether he could consider a parent's immigration status or residency in another country in determining the best interests of the child. More specifically, the judge wondered whether he could consider immigration status as a nonenumerated factor under the statute governing the best interests of the child. The judge recalled that he said he thought it could be a proper consideration and asked the lawyers for any cases or other authority they had on the issue. The judge clarified that he never intended to approach the custody hearing with the perception of trying to help either party with their immigration status and was only concerned about the best interests of the child. The district judge also stated, "[T]o the point where I got involved in the case, the de facto arrangements were, this girl had grown up more with her [D]ad and his family than with Mom and her family; and that the status quo was, really, Dad having primary residency."

Under K.S.A. 20-311d, if Ortega wanted to pursue disqualification, she had to immediately file a legally sufficient affidavit with the chief judge stating the grounds on which she relied. Although Ortega filed a motion to recuse with the chief judge, the affidavit is not included in the record on appeal. A party claiming error has the burden to designate a sufficient record on appeal. *State v. Bridges*, 297 Kan. 989, 1001, 306 P.3d 244 (2013). Because the affidavit Ortega submitted to the chief judge is not in the record, we cannot say if it was legally sufficient—substantially impeding our review of the issue.

See *Moyer*, 306 Kan. at 372. Regardless, the chief judge held a hearing on the motion to recuse; Ortega argued that the assigned judge exhibited impermissible bias or prejudice under K.S.A. 20-311d(c)(5).

Even if Ortega filed a legally sufficient affidavit, she arguably failed to file a timely motion to recuse before the trial. K.S.A. 20-311f requires a party to move for a change of judge "within seven days after pretrial, or after receiving written notice of the judge before whom the case is to be heard, whichever is later." The statute requires the party seeking recusal to promptly file a motion when the ostensible grounds become apparent. Ortega plainly did not do so. The pretrial conference—during which the judge made the challenged comments—was held in early May. The district court conducted the evidentiary hearing on primary residential custody in late June. And Ortega filed her motion for disqualification on July 23—more than two months after the judge made the supposedly prejudicial comments. More tellingly, Ortega filed the motion to disqualify three days after the judge entered the temporary order granting primary residential custody to Peralta-Diaz in what could only be construed as a near definitive harbinger of the final ruling.

The chronology displays what, at best, appears to be a shabby litigation tactic on Ortega's part. But it also illustrates a circumstance undercutting the substance of the claim for disqualification. Ortega did not immediately seek disqualification of the judge after his remarks at the pretrial conference, strongly suggesting she took no issue with them or at least did not believe they betrayed some deep-seated prejudice against her. So Ortega chose to go forward with the evidentiary hearing on the custody issue. Only when it became clear after the hearing that Ortega was likely to lose, given the temporary order, did she raise the matter of disqualification. In short, Ortega was perfectly comfortable speculating on the outcome of the custody hearing and only when that outcome didn't meet her expectations did she cry foul. The law justifiably looks askance at that kind of game-playing. *Worth v. Benton County Circuit Court*, 351 Ark. 149, 155, 89 S.W.3d 891

10

(2002) ("[A] party may not speculate on the outcome and thereafter take advantage of a fact supporting disqualification known but not raised by him until after an adverse decision is rendered."); *Brauhn v. Brauhn*, 10 Wash. App. 592, 597-98, 518 P.2d 1089 (1974); cf. *Camco Construction, Inc. v. Utah Baseball Academy, Inc.*, 243 P.3d 1269, 1273 (Utah 2010) (lawyer must file motion to disqualify judge at "first opportunity" after learning of grounds, since "undue delay . . . is costly, wasteful, and prevents the speedy resolution of matters"). Moreover, had Ortega truly believed the judge's remarks at the pretrial conference revealed an impermissible prejudice against her, we may presume she would have acted promptly in her self-interest, as contemplated in K.S.A. 20-311f, to rectify the problem.

On the merits, Ortega contends the district judge was partial to Peralta-Diaz before trial began, leading to the decision granting him primary custody of A.P. In this respect, K.S.A. 20-311d(d) sheds light on the issue, assuming it were otherwise properly presented:

> "In any affidavit filed pursuant to this section, the recital of previous rulings or decisions by the judge on legal issues or concerning the legal sufficiency of any prior affidavits filed by counsel for a party in any judicial proceeding . . . shall not be deemed legally sufficient for any belief that bias or prejudice exists."

Without the affidavit in the record, we can't tell whether Ortega alleged specific facts or simply recited the judge's decision on the legal issues. Given the presentation in Ortega's appellate brief, she apparently based her request for recusal on the judge's earlier custody rulings favoring Peralta-Diaz. Similarly, at the recusal hearing, Ortega's lawyer argued the point this way:

> "But I think it's also incumbent that, at that particular time when you're making that statement, you've got two LCM recommendations that indicated to the Court—and that was part of the record—that indicated that [Ortega] should have primary custody.

11

And that if there was any type of leaning at that point, that the leaning should have went toward the respondent, [Ortega], because that's what the LCM manager was recommending at the time to the court, Judge; that to lean the other direction, outside of what the LCM was saying in the recommendation and what they reported to the Court, even before she testified, that it's inappropriate and unfair to the respondent."

Ortega's lawyer, thus, expressed discontent with the judge's rulings as a basis for disqualification. But, "a judge may not be disqualified when the movant merely recites previous rulings the judge has made on legal issues. K.S.A. 20-311d(d)." *Bloom v. Arnold*, No. 107,372, 2012 WL 3966696, at *5 (Kan. App. 2012) (unpublished opinion); see *Hajda v. University of Kansas Hosp. Auth.*, 51 Kan. App. 2d 761, 777, 356 P.3d 1 (2015) ("The fact the district court ruled against her 'presents a legally insufficient basis for a finding of bias or prejudice on the part of the trial judge.'").

Aside from any procedural issues, Ortega must state the facts and the reasons for her belief that bias, prejudice, or an interest exists. Here, the chief judge held the facts did not show the trial judge was biased. Ortega contends the chief judge's decision to deny the recusal motion was erroneous because he looked at the trial judge's statements within their context. Ortega argues the chief judge should have looked solely at the challenged statements. But the Kansas Supreme Court has indicated the affidavit must place the judicial statements or conduct purportedly requiring disqualification in a meaningful context. See *Sawyer*, 297 Kan. at 908. If not, the affidavit may be considered legally insufficient. The chief judge presumably had the latitude to consider the pretrial conference statement in full context. See *State v. Griffen*, 241 Kan. 68, 71-72, 734 P.2d 1089 (1987) (Kansas Supreme Court considers "totality of circumstances" in finding district court's characterization of criminal defendant as "'a mean mother'" in presentencing conference with lawyers to be inappropriate but not indicative of prejudicial predisposition warranting recusal). The chief judge stated that, given the context, the statement did not suggest the hearing judge decided the matter in advance or was prejudiced against Ortega. As we have said, the minute journal entry explains the

12

statement "appears to be more an effort to focus the arguments of counsel on an issue the judge considered to be preeminent rather than musing on the fact that he had already decided the case."

Here, the trial judge thoroughly outlined his reasons for stating he was leaning towards Peralta-Diaz' position. The trial judge explained that he was not partial to Peralta-Diaz because of any immigration status nor was he interested in preventing anyone from being deported. Rather, he was leaning towards Peralta-Diaz' legal position because the child had resided with Peralta-Diaz for most of her young life. Even so, nothing in that statement suggested the judge would ignore the evidence presented at trial. The trial judge expressed uncertainty as to whether he could even consider a party's immigration status or residency outside of the United States as a nonenumerated factor under the best interests of the child statute. The trial judge asked that the parties provide legal authority on this point, but neither party did. Generally, a judge's comments and rulings should be limited to what is reasonably required for the orderly progress of the trial and should refrain from unnecessary disparagement of persons or issues. *State v. Hayden*, 281 Kan. 112, 125, 130 P.3d 24 (2006). On balance, the hearing judge's comments were made to define a particular legal issue and to invite arguments from the lawyers on that issue rather than to disregard Ortega's case for primary residential custody of A.P.

Aside from the hearing judge's comment at the pretrial conference, Ortega does not point to any other evidence suggesting the judge had come to a predetermined ruling on Peralta-Diaz' custody motion. Although the judge stated he was leaning toward Peralta-Diaz because that was the status quo at the time, he explained his reasons were based on the best interests of the child and were in reference to determining what factors the court could consider in making that determination.

13

Under the circumstances, the timing of Ortega's motion for recusal or disqualification alone is a sufficient basis to deny her any relief and to affirm the district court rulings doing so. Even on the merits, a reasonable person would conclude the comments did not demonstrate the hearing judge was unable to properly weigh the evidence presented on the custody motion and to come to a fair conclusion. The grounds on which Ortega sought recusal were legally insufficient to set aside the order granting primary residential custody to Peralta-Diaz or to require the hearing judge to recuse in any further proceedings related to A.P.

*Granting Primary Residential Custody to Peralta-Diaz*

Our standard of review provides: "Given the district court's unique vantage point of what is often an emotionally charged situation in child custody disputes, an appellate court generally will not overturn such decisions unless the court abused its discretion." *In re Marriage of Bahlmann*, 56 Kan. App. 2d 901, 903, 440 P.3d 597 (2019). Discretion may be abused in three ways: (1) when the ruling is based on an error of law, (2) when the ruling is based on an error of fact, or (3) the ruling was arbitrary, fanciful, or unreasonable. *Wiles v. American Family Life Assurance Co.*, 302 Kan. 66, 74, 350 P.3d 1071 (2015).

To the extent the parties challenge the sufficiency of the evidence underlying the decision, we review the evidence in a light most favorable to the prevailing party to determine if the district court's factual findings are supported by substantial competent evidence and whether those findings, in turn, support the ultimate legal conclusion. This court may not reweigh evidence, pass on witness credibility, or redetermine questions of fact. *Marriage of Bahlmann*, 56 Kan. App. 2d at 903-04; *In re Marriage of Vandenberg*, 43 Kan. App. 2d 697, 704-05, 229 P.3d 1187 (2010).

14

On appeal, Ortega argues the facts do not support a finding that Peralta-Diaz should be A.P.'s primary residential custodian. Ortega contends the district court erred in awarding Peralta-Diaz primary custody because it only looked at Ortega's behavior before 2016—when she received shared custody. Further, even though the district court did not find Peralta-Diaz' felony conviction for a crime concerning dishonesty particularly significant, Ortega argues the district court seemed to find her theft crime notably troubling. Ortega also argues the district court placed considerable weight on its conclusion Ortega caused Peralta-Diaz to be arrested and charged with using the fraudulent identity documents to obtain employment. Further, Ortega argues the district court erred in not taking into account the LCM's recommendation that she be given primary custody of A.P. Ortega, therefore, requests we reverse the custody order and remand with directions for a new hearing in front of a different district court judge.

Conversely, Peralta-Diaz argues the district court was allowed to consider all evidence from the time A.P. was born in determining her best interests with respect to parental custody. And that's especially so, according to Peralta-Diaz, because Ortega did not make a contemporaneous objection to the evidence. Additionally, Peralta-Diaz asserts Ortega's lack of overall credibility, given her inconsistent statements throughout the evidentiary hearing, damaged her more than the theft crime itself.

K.S.A. 2018 Supp. 23-3203(a) provides a nonexclusive list of factors a district court may consider in determining the legal custody of a child. Those factors are:

> "(1) Each parent's role and involvement with the minor child before and after separation;
> "(2) the desires of the child's parents as to custody or residency;
> "(3) the desires of a child of sufficient age and maturity as to the child's custody or residency;
> "(4) the age of the child;
> "(5) the emotional and physical needs of the child;

15

"(6) the interaction and interrelationship of the child with parents, siblings and any other person who may significantly affect the child's best interests;

"(7) the child's adjustment to the child's home, school and community;

"(8) the willingness and ability of each parent to respect and appreciate the bond between the child and the other parent and to allow for a continuing relationship between the child and the other parent;

"(9) evidence of domestic abuse, including, but not limited to:

(A) A pattern or history of physically or emotionally abusive behavior or threat thereof used by one person to gain or maintain domination and control over an intimate partner or household member; or

(B) an act of domestic violence, stalking or sexual assault;

"(10) the ability of the parties to communicate, cooperate and manage parental duties;

"(11) the school activity schedule of the child;

"(12) the work schedule of the parties;

"(13) the location of the parties' residences and places of employment;

"(14) the location of the child's school;

"(15) whether a parent is subject to the registration requirements of the Kansas offender registration act, K.S.A. 22-4901 et seq., and amendments thereto, or any similar act in any other state, or under military or federal law;

"(16) whether a parent has been convicted of abuse of a child, K.S.A. 21-3609, prior to its repeal, or K.S.A. 2018 Supp. 21-5602, and amendments thereto;

"(17) whether a parent is residing with an individual who is subject to registration requirements of the Kansas offender registration act, K.S.A. 22-4901 et seq., and amendments thereto, or any similar act in any other state, or under military or federal law; and

"(18) whether a parent is residing with an individual who has been convicted of abuse of a child, K.S.A. 21-3609, prior to its repeal, or K.S.A. 2018 Supp. 21-5602, and amendments thereto."

A district court should determine which of the statutory factors apply in a given case—some likely will not—and consider how they bear on the child custody issue at hand. Although the district court ought to assess all of the relative factors, its final order need not catalogue each of them or recapitulate in detail the evidence pertinent to each.

16

*Marriage of Vandenberg*, 43 Kan. App. 2d at 703; *In re Marriage of Ziebart*, No. 117,293, 2018 WL 1545786, at *11 (Kan. App. 2018) (unpublished opinion); *Frakes v. Frakes*, No. 114,954, 2016 WL 4414021, at *5 (Kan. App. 2016) (unpublished opinion). The order may sweep more broadly in describing the evidence and the reasons for the ultimate custody determination. At the same time, a final order should not be cryptically terse. The overarching consideration remains what custody arrangement serves the best interests of the child. K.S.A. 2018 Supp. 23-3201; *Harrison v. Tauheed*, 292 Kan. 663, 672, 256 P.3d 851 (2011).

Here, the district court identified the relevant statutory factors to be K.S.A. 2018 Supp. 23-3203(a)(1), (4), (5), (6), (7), (8), (12), and (13) and found all of them favored granting Peralta-Diaz primary residential custody of A.P. As we have indicated, the district court determined none of the factors weighed in favor of Ortega.

On appeal, Ortega effectively asks us to reweigh evidence—something we cannot do. Because Ortega casts the appellate issue as one of sufficiency of the evidence, we must determine whether there is substantial competent evidence to support the district court's ultimate custody decision. Although the journal entry does not tie particular factual findings to particular statutory factors, there is ample evidence to support the custody order.

As to factor (1), the district court noted that Ortega had been arrested for theft when the child was only a few months old. After Ortega initially lied about who A.P.'s father was, Peralta-Diaz quickly obtained primary custody and retained custody for several years. The district court then ordered shared parenting time for about two years, leading up to the 2018 custody hearing. While both parents have been actively involved with A.P., Peralta-Diaz has had substantially more time overall with the child. As to factor (4), A.P. was about five years old at the time of trial and spent the majority of her life with Peralta-Diaz.

17

As to factors (5), (6), and (7), Peralta-Diaz and his family members all testified that A.P. is very close with her father, her cousins, and other paternal relatives. A.P. attends birthday parties, other family events, church services, and social functions with her paternal relatives. They all testified A.P. is very happy when she is with her father. There is always someone from the extended family to watch A.P. when Peralta-Diaz is at work.

Conversely, Ortega could not establish any strong ties between her family and A.P. Although Ortega presented evidence that A.P. has an adult half-brother who lives with Ortega, the district court found Ortega failed to satisfactorily prove any other family members lived in Texas. Ortega testified she has uncles, a brother, a sister, and her own mother there. The photographs she introduced as evidence at the custody hearing depicted only A.P. and her. Peralta-Diaz and his family members testified they had met only Ortega's brother and son. The LCM also testified that she had no knowledge of Ortega's family residing in Texas. The district court expressly found Ortega to not be credible on this and other matters.

As to factor (8), each parent testified that he or she respects the bond between A.P. and the other. Ortega testified she thought Peralta-Diaz was a great dad but he seemed to be mainly concerned about whether he will be deported. Peralta-Diaz testified he requires A.P. to call Ortega when the child is with him. Conversely, he said he had to initiate telephone calls to A.P. when she was staying with Ortega. Peralta-Diaz testified he called A.P. almost every day when she was with Ortega. Peralta-Diaz testified there is tension between Ortega and him but they are able to communicate with each other. Peralta-Diaz' family members also testified they respected the bond between A.P. and Ortega and they attempted to foster good relationships between both parents and between the parents and A.P.

18

In its final order, the district court also found that

> "where one parent takes affirmative steps with the assistance of counsel to cause the minor child's other parent to be subject to criminal prosecution and removal for working on bogus papers, that parent is acting contrary to the best interests of the minor child by failing to foster and respect the bond between the other parent . . . a factor to be considered under K.S.A. 23-3203(a)(8)."

The district court found, based on circumstantial evidence, that Ortega played some part in the sequence of events culminating in immigration authorities taking Peralta-Diaz into custody. There was no direct evidence to that effect. But the district court could draw reasoned inferences from the timing of various circumstances and the resulting effect on Peralta-Diaz. We are not prepared to set aside that conclusion, and Ortega has not pointed to record evidence that would cause us to do so.

As to factors (12) and (13), the work schedules and locations of employment were heavily contested. Although Peralta-Diaz worked about one to two hours away from Wichita, relevant testimony showed he had a flexible schedule that changed when A.P. was with him. Additionally, Peralta-Diaz had been working with the same company for 12 years before his arrest, and so he had a steady income for most of A.P.'s life. Peralta-Diaz testified he had obtained a work permit and hoped to be rehired at the company. In contrast, Ortega cleaned homes on an irregular basis and worked 26 weeks a year. Ortega testified she would stay home with A.P. all the time when they shared custody and would work when A.P. was with Peralta-Diaz. The district court found glaring discrepancies between Ortega's testimony about her work and income and documents, including tax returns and income statements, presented during the hearing purportedly showing her earnings. The district court found Ortega was not credible in explaining what she earned and inferred she had undisclosed and possibly questionable sources of income.

The record supports the district court's findings. Although the district court mentioned certain events from Ortega's past, such as her criminal history, that she initially lied about A.P.'s paternity, inconsistencies with income, and that she may have facilitated Peralta-Diaz' arrest, the district court ultimately found Ortega's testimony not credible. In its order, the district court concluded it "cannot find any of [M]other's representations about what is going on in San Antonio reliable. There is virtually no independently verified information about who she is associating with there." That determination necessarily pushed the district court to favor granting primary residential custody to Peralta-Diaz, given the credible evidence about his family in the Wichita area and their overall circumstances.

In its order, the district court surveyed much of the evidence and made detailed findings of fact drawn from the evidence, including the credibility determinations. We do not second-guess those findings by reweighing the evidence or jettisoning the credibility choices. Within those boundaries, there is more than substantial evidence for the district court's ruling that granting Peralta-Diaz primary residential custody promoted A.P.'s best interests.

The district court specifically stated that making a child custody decision for the principal purpose of improving a parent's immigration status would be unacceptable. That sort of calculation would impermissibly subordinate the child's best interests. The district court recognized that the adverse impact of a custody decision on one parent's immigration status could be a nonstatutory factor to be considered to the extent deportation, when weighed with all of the other relevant factors, would be contrary to the child's best interests. Ultimately, the district court did not base its decision on the immigration status of either Peralta-Diaz or Ortega. The district court stated that independent of any deportation issues, it had "a high level of security" with placing A.P. with Peralta-Diaz and his family in Wichita and "a low level of security" with placing her with Ortega in Texas. The district court evaluated all the evidence and could not

20

reconcile the inconsistencies in Ortega's testimony. The district court did not abuse its discretion in granting primary residential custody of A.P. to Peralta-Diaz.

*Request for Attorney Fees for Appeal*

On May 7, 2019, Peralta-Diaz filed a timely motion asking that Ortega pay the attorney fees he incurred for this appeal, as provided in Kansas Supreme Court Rule 7.07(b) (2019 Kan. S. Ct. R. 50) and K.S.A. 2018 Supp. 23-2216(a). Peralta-Diaz submitted a supporting affidavit and a one-page document characterized as an "invoice breakdown" showing summaries of bills for services his lawyers performed between June 12, 2018, and May 7, 2019. The document shows the date of the invoice, the fees billed on the invoice, payments received, and the balance due. The document does not describe the legal work performed or itemize the time spent on particular tasks. The motion itself does not contain a specific fee request. The affidavit states without further detail or explanation that the attorney fees for the appeal total $3,918.

Supreme Court Rule 7.07(b) provides that an appellate court may award attorney fees for services on appeal in a case in which the district court had authority to award attorney fees. Here, the district court had the statutory authority to award attorney fees to either party in a child custody proceeding as justice and equity might require. K.S.A. 2018 Supp. 23-2216. Supreme Court Rule 7.07(b)(2) (2019 Kan. St. Ct. R. 51) states:

> "If oral argument is waived, the motion must be filed no later than 14 days after the day argument is waived or the date of the letter assigning the case to a non-argument calendar, whichever is later. An affidavit must be attached to the motion specifying:
> "(A)    the nature and extent of the services rendered;
> "(B)    the time expended on the appeal; and
> "(C)    the factors considered in determining the reasonableness of the fee [found under the Kansas Rules of Professional Conduct 1.5 (2019 Kan. S. Ct. R. 300)]."

21

Other panels of this court have emphasized the importance of complying with these requirements. In *In re Estate of Mouchague*, 56 Kan. App. 2d 983, 993-94, 442 P.3d 125 (2019), the panel denied the attorney fees request because the party failed to provide a detailed list of expenses related to the appeal and failed to address the reasonableness factors:

> "The motion attached several documents which establish to our satisfaction that Diehl is entitled to attorney fees. But the motion failed to attach any detailed affidavit setting out the factors we must consider in determining the reasonableness of the fee. Rule 7.07(b)(2) requires a party seeking attorney fees on appeal to attach to the motion an affidavit that specifies the nature and extent of the services rendered, the time expended on the appeal, and the factors considered in determining the reasonableness of the fee under Kansas Rule of Professional Conduct 1.5(a) (2019 Kan. S. Ct. R. 300)."

The affidavit in *Mouchague* recited only the facts necessary to show that a fee award for defending the appeal was legally permitted. The affidavit did not state how much time was spent on what tasks by which lawyers or support staff; nor did it address the eight factors of reasonableness. The panel noted the affidavit did not include invoices or other details. Because the party did not provide sufficiently specific information about the work generating the fees, the panel could not determine whether the fee request was reasonable. See *Thoroughbred Assocs. v. Kansas City Royalty Co.*, 45 Kan. App. 2d 312, 338, 248 P.3d 758 (2011) ("[C]ounsel for the party seeking fees are expected to furnish the court with detailed billing records and other materials from which the information necessary to a reasoned fee determination may be readily extracted."), *aff'd in part and rev'd in part* 297 Kan. 1193, 308 P.3d 1238 (2013).

Similar to *Mouchague*, Peralta-Diaz also failed to comply with some of the Supreme Court Rule 7.07(b) requirements. Peralta-Diaz filed the motion for attorney fees before this case was assigned to the summary calendar docket, thus, this motion was timely. Peralta-Diaz also listed six of the eight reasonableness factors that applied to his

case and stated he expended a significant amount of money on this appeal. But Peralta-Diaz failed to provide an affidavit or supporting documents describing with particularity the tasks his lawyer performed in handling the appeal and the amount of time expended on each task. As such, the motion for attorney fees and the supporting materials afford us no way to determine the reasonableness of the request. We, therefore, deny the motion.

The district court's order granting primary residential custody of A.P. to Peralta-Diaz is affirmed. Peralta-Diaz' motion for attorney fees on appeal is denied.